Filed 8/25/17

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| In re TYRONE A. MILLER on Habeas Corpus. | B278902 (Los Angeles County Super. Ct. No. BA226937) |
| --- | --- |

ORIGINAL PROCEEDINGS; petition for writ of habeas corpus. Norman P. Tarle, Judge. Petition granted.

Leslie Conrad, under appointment by the Court of Appeal, for Petitioner.

Xavier Becerra, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Paul M. Roadarmel, Jr., Supervising Deputy Attorney General, Allison H. Chung, Deputy Attorney General, for Respondent.

In August 2002, a jury convicted petitioner Tyrone A. Miller (defendant) of the first degree felony murder of Rene Franco (Franco) (Pen. Code, § 187, subd. (a))[1] and the second degree robbery of Ana Saravia (Saravia) (§ 211). Defendant was not the person who shot Franco, nor was he present at the scene when the shooting occurred; instead, he was convicted of murder for aiding and abetting an associate who shot Franco after snatching Saravia's purse. The jury found the killing occurred in the commission of a robbery within the meaning of section 190.2, subdivision (a)(17)(A)—a "special circumstance" that required a sentence of life in prison without the possibility of parole (§ 190.2, subd. (d)). Years later, our Supreme Court decided *People v. Banks* (2015) 61 Cal.4th 788 (*Banks*) and *People v. Clark* (2016) 63 Cal.4th 522 (*Clark*), which discuss when section 190.2 authorizes a special circumstance life without parole sentence for a felony-murder defendant convicted as an aider and abettor. We consider whether *Banks* and *Clark*, which explain what it means for an aiding and abetting defendant to be a "major participant" who acted with a "reckless indifference to human life," entitle defendant to a writ of habeas corpus ordering resentencing because the special circumstance finding cannot stand.

## I. BACKGROUND

On May 26, 2000, defendant, Derrick Patton (Patton), and Melvin Tate (Tate)—who was 17 years old at the time—met at Tate's house where they discussed defendant's plan to commit a "follow-home robbery." Defendant, Patton, and Tate were all

---

[1] Undesignated statutory references that follow are to the Penal Code.

members of the 4-Deuce Crips street gang and had committed follow-home robberies with one another, and with others, in the past.

The robberies were typically conducted as follows: A "spotter" would go into a bank, locate a person withdrawing a large amount of cash, and identify that person for the others involved in committing the robbery. The "driver" would tail the victim to his or her destination, and the "getter" would take the money. According to Tate, who testified as a witness for the prosecution at trial, they did not always carry a gun during follow-home robberies; it depended on the age, size, and sex of the victim, as well as whether the victim was alone.

Tate estimated he had participated in six prior robberies with Patton and seven or eight with defendant. Tate recalled, in particular, two prior follow-home robberies he committed with defendant. In one, defendant served as the spotter and Tate carried a fake gun. In the other, the victim was a woman and defendant's role was not specified. As for robberies he committed with Patton, Tate recalled only one instance involving a gun. Patton was carrying the gun in his pocket during the robbery. When the victim grabbed onto him during a scuffle, the gun went off, shooting Patton in the arm.

On the date of Franco's murder, defendant was the spotter, Patton the driver, and Tate the getter. Defendant entered a bank with his young daughter while Patton and Tate remained in Patton's car across the street. Saravia and Franco were inside the bank at the time, and Saravia withdrew $7,500 she planned to use to buy a car. Defendant exited the bank after Saravia and Franco and instructed Patton and Tate to "follow the blue van." He told them Saravia had "a lot of money" in her purse.

3

Saravia and Franco drove to an automobile dealership and parked about half a block from its entrance. Patton parked his car in the dealership's driveway. He retrieved a gun from the driver's side door panel and tossed it to Tate, saying, "[m]ake sure you get the purse."

Saravia was "short" and "kind of heavyset." Franco was a "big guy" but "older" and "walked like he had a limp." As Franco and Saravia walked past Tate, he grabbed Saravia's purse. Saravia fell to the ground, and Tate told her not to get up. When Franco moved towards Tate, Tate shot him in the chest. Franco, despite being shot, managed to get back in his van, but he was unable to drive on account of his wound. He died before he could be treated at a hospital.

Tate jumped back into Patton's car, and they went to defendant's house to divide the money. Tate received $500 of the $7,500.

Police connected Tate to the scene of Franco's murder with DNA evidence found during their investigation. Tate pled guilty to one count of first degree murder and agreed to testify against defendant and Patton in the expectation he would receive a prison sentence of 25 years to life (with the possibility of parole) and the prosecution would drop several robbery charges against him. When the police arrested Patton, they found a gun in his car that resembled the gun Tate said he used to kill Franco.

Defendant and Patton were jointly tried in August 2002. The jury convicted both men of the first degree murder of Franco on an aiding and abetting theory, as well as the second degree robbery of Saravia. The jury found true the section 190.2 robbery-murder special circumstance alleged by the prosecution, as well as a section 12022.53, subdivision (d) sentence

4

enhancement alleging a principal personally and intentionally discharged a firearm, causing death. The trial court sentenced defendant to a prison term of life without the possibility of parole based on the robbery-murder special circumstance, plus 25 years to life (with the possibility of parole) pursuant to the section 12022.53, subdivision (d) enhancement. The court stayed sentences imposed on the robbery conviction and other enhancements the jury found true.

Defendant appealed his conviction and argued, among other things, the evidence was insufficient to support the robbery-murder special circumstance finding. We affirmed the judgment in an unpublished opinion. (*People v. Patton* (Oct. 20, 2003, B163619) [nonpub. opn.].)

Much later, in September 2016, defendant filed a petition for a writ of habeas corpus in the superior court, contending our Supreme Court's recent decision in *Banks*, *supra*, 61 Cal.4th 788 required the court to vacate his sentence of life imprisonment without parole, which rested on the special circumstance finding. The court denied his petition. Defendant then filed a pro se petition for a writ of habeas corpus in this court, again seeking relief based on *Banks*. We appointed counsel to represent defendant, and counsel filed an amended petition on his behalf. We subsequently ordered the Department of Corrections and Rehabilitation to show cause why a writ should not issue.

## II. DISCUSSION

Defendant contends our Supreme Court's recent decisions in *Banks*, *supra*, 61 Cal.4th 788 and *Clark*, *supra*, 63 Cal.4th 522, which explain when a felony-murder aider and abettor may be sentenced to life in prison without the possibility of parole,

5

compel the conclusion that the evidence against him was insufficient to justify the special circumstance finding. In response, the Attorney General argues defendant is not entitled to rely on *Banks* and *Clark* for a host of reasons, most of which are procedural: because claims of insufficient evidence are not reviewable by way of a habeas corpus petition; because defendant is procedurally barred from asserting his claim following this court's prior rejection of it on direct appeal; because *Banks* and *Clark* should not apply "retroactively"; and, on the merits, the evidence against him is sufficient to show he was a major participant who acted with reckless indifference to human life even on the understanding espoused in *Banks* and *Clark*.

We conclude the *Banks* and *Clark* decisions govern the disposition of defendant's habeas petition and, further, that the standards articulated in those decisions entitle him to the relief he seeks. After reviewing the record of defendant's conduct against the requirements for section 190.2, subdivision (d) discussed in *Banks* and *Clark*, we are convinced the evidence against defendant would not permit a jury to rationally conclude he exhibited a reckless indifference to human life. Among other relevant considerations, defendant was not present at the scene of the crime and there was no evidence he knew lethal force was appreciably more likely than that inherent in a "garden-variety armed robbery, where death might be possible but not probable . . . ." (*Banks*, *supra*, 61 Cal.4th at p. 802.)

> A.   *The Robbery-Murder Special Circumstance, and the Banks and Clark Decisions*

In 1990, state voters passed Proposition 115, which "revised the scope of capital liability for aiding and abetting

6

felony murders by looking to federal constitutional law." (*Banks*, *supra*, 61 Cal.4th at p. 798.) Section 190.2, subdivision (d) provides that "every person, not the actual killer, who, with reckless indifference to human life and as a major participant, aids, abets, counsels, commands, induces, solicits, requests, or assists in the commission of a [specified felony, including robbery,] which results in the death of some person or persons, and who is found guilty of murder in the first degree therefor, shall be punished by death or imprisonment in the state prison for life without the possibility of parole if a[n enumerated] special circumstance . . . has been found to be true under Section 190.4." "The statute thus imposes both a special actus reus requirement, major participation in the crime, and a specific mens rea requirement, reckless indifference to human life." (*Banks*, *supra*, at p. 798, fn. omitted.) Participating in a robbery-murder is one of the special circumstances for which an aider and abettor may be punished by death or life imprisonment without parole. (§ 190.2, subd. (a)(17)(A).)

### 1. Banks

In the 2015 *Banks* case, our Supreme Court discussed "under what circumstances an accomplice who lacks the intent to kill may qualify as a major participant so as to be statutorily eligible for the death penalty" or life imprisonment without parole.[2] (*Banks*, *supra*, 61 Cal.4th at p. 794.)

---

[2] The *Banks* court noted that its analysis of section 190.2, subdivision (d) applied equally to sentences of life imprisonment without parole. (*Banks*, *supra*, 61 Cal.4th at p. 804.)

7

Before the Supreme Court was the appeal of Lovie Troy Matthews (Matthews), who served as the getaway driver for an armed robbery in which a security guard was killed. (*Banks*, *supra*, 61 Cal.4th at p. 794.) Leon Banks (Banks), David Gardiner (Gardiner), and Brandon Daniels (Daniels) attempted to rob a medical marijuana dispensary. (*Id*. at p. 795.) Banks and at least one of the other men were armed. (*Ibid*.) When Banks, Gardiner, and Daniels were fleeing the dispensary, Banks and a security guard began shooting at each other, and Banks killed the guard. (*Ibid*.) Matthews was not present at the scene of the robbery, but he picked up Daniels and Gardiner a block away shortly thereafter. (*Ibid*.)

Matthews, Daniels, and Gardiner were all members of the same criminal street gang. (*Banks*, *supra*, 61 Cal.4th at p. 796.) At a joint trial of Matthews and Banks, no evidence was presented that Matthews, Daniels, or Gardiner had killed in the past, or that Matthews knew Banks had killed anyone before the marijuana dispensary robbery when he shot the guard. (*Ibid*.) The jury convicted Matthews of first degree murder and found true the robbery-murder special circumstance, which resulted in Matthews receiving a prison sentence of life without the possibility of parole. (*Id*. at p. 797.)

To determine whether Matthews's sentence was permitted under section 190.2, subdivision (d), our state's high court looked to two United States Supreme Court decisions: *Tison v. Arizona* (1987) 481 U.S. 137 (*Tison*), the holding of which was "mirrored" in the language of section 190.2, subdivision (d) (*Banks*, *supra*, 61 Cal.4th at p. 798), and an earlier case, *Enmund v. Florida* (1982) 458 U.S. 782 (*Enmund*). *Enmund* and *Tison* both addressed the constitutionality of sentencing a felony-murder defendant to

8

death where the defendant did not actually commit the killing and there was no proof the defendant specifically intended to kill. The decisions have come to embody two points on a continuum of culpability, with the defendant in *Enmund* presenting an example of conduct insufficient to permit capital punishment while the defendants in *Tison* serve as an example of conduct plainly sufficient to demonstrate major participation and reckless disregard for human life, which justifies a sentence of death.

In *Enmund*, the defendant was the getaway driver in an armed robbery in which his associates killed two people. There was some evidence Enmund planned the robbery (*Enmund*, *supra*, 458 U.S. at p. 803 (dis. opn. of O'Connor, J.)) but no evidence he was present when the killing occurred (*id.* at p. 786 (maj. opn. of White, J.)). The high court held sentencing to death "one such as Enmund who aids and abets a felony in the course of which a murder is committed by others but who does not himself kill, attempt to kill, or intend that a killing take place or that lethal force will be employed" violated the Eighth Amendment. (*Id.* at p. 797.) The court emphasized imposing a sentence of death must be commensurate with the defendant's *individual* culpability, "not on that of those who committed the robbery and shot the victims . . . ." (*Id.* at p. 798.) Because "Enmund himself did not kill or attempt to kill" and the record did "not warrant a finding that Enmund had any intention of participating in or facilitating a murder," his culpability could not be equated with that of his confederates who actually robbed and killed. (*Ibid*.) The high court further observed that the probability a robbery would result in a killing was not "so substantial that one should share the blame for the killing if he somehow participated in the felony." (*Id.* at p. 799.)

9

In *Tison*, on the other hand, the United States Supreme Court concluded the defendants, Ricky (Ricky) and Raymond (Raymond) Tison, could be sentenced to death even though they did not actually commit the murders in question and did not specifically intend the victims to die.  Ricky and Raymond, along with another brother and other relatives, planned to break their father, Gary Tison (Gary), and his cellmate out of prison.  (*Tison*, *supra*, 481 U.S. at p. 139.)  The sons accomplished the escape by entering the prison with an ice chest full of guns, arming Gary and his cellmate, and locking guards and visitors in a closet.  (*Ibid*.)  Both Gary and his cellmate were convicted murderers; Gary had killed a guard in a previous prison escape.  (*Ibid*.)

The escape vehicle got a flat tire during the course of their flight from the prison, and they decided to steal a car.  (*Tison*, *supra*, 481 U.S. at pp. 139-140.)  Raymond flagged down a passing vehicle while the others armed themselves and hid.  (*Id*. at p. 140.)  The car was occupied by a married couple, their toddler, and their teenage niece (hereafter the Lyons family), and the others in hiding emerged when the car stopped and then forced the Lyons family into the backseat of their car.  (*Ibid*.)  Raymond drove the escape vehicle into the desert, while Ricky, Gary, and his cellmate followed in the Lyons family car.  (*Ibid*.)

Once out in the desert, the Lyons family father pleaded with the group not to kill them.  (*Tison*, *supra*, 481 U.S. at p. 140.)  Gary, however, was clearly contemplating it.  (*Ibid*.)  Ricky and Raymond went to get some water, and when they returned and were within sight of the others, they saw Gary and his cellmate raise their shotguns and shoot the Lyons family.  (*Id*. at p. 141.)  According to Ricky and Raymond, they were surprised by

10

the shooting but they did nothing to stop it or to aid the victims.[3] (*Ibid*.)

The police apprehended the Tisons and Gary's cellmate several days later. (*Tison*, *supra*, 481 U.S. at p. 141.) Raymond and Ricky were tried and convicted of the murder of the Lyons family, plus associated felonies, and sentenced to death. (*Ibid*.)

In considering Raymond and Ricky's challenges to their capital sentences, the high court relied on and distinguished its prior decision in *Enmund*. The court reaffirmed the principle announced in *Enmund* that imposing the death sentence on an aider and abettor who had no intent or purpose that life would be taken would violate the Eighth and Fourteenth Amendments. (*Tison*, *supra*, 481 U.S. at p. 148.) In addition, mere foreseeability that a murder might occur in the course of an armed robbery does not establish a defendant specifically intends to kill "in the traditional sense" because "[p]articipants in violent felonies like armed robberies can frequently 'anticipat[e] that lethal force . . . might be used'" and that anticipation "amounts to little more than a restatement of the felony-murder rule itself." (*Id*. at pp. 150-151.) The high court held, however, that even without a specific intent to kill, an aiding and abetting felony-murder defendant who exhibited substantial participation in the felony, combined with a mental state of reckless indifference to human life, could be sentenced to death. (*Id*. at pp. 157-158.)

As it had done in *Enmund*, the *Tison* court conducted an individualized assessment of Raymond and Ricky's culpability. In doing so, the court found Raymond and Ricky's participation in

---

[3]     There was evidence the niece was still alive for a time after the shooting. (*Tison*, *supra*, 481 U.S. at p. 141.)

11

the deaths of the Lyons family to be "anything but minor." (*Tison*, *supra*, 481 U.S. at p. 152.)  The brothers knowingly armed two convicted murderers, one of whom had killed a guard in a previous prison escape.  (*Id.* at p. 151.)  Raymond admitted he was prepared to kill during the subsequent escape.  (*Ibid.*)  Raymond lured the Lyons family into the clutches of his armed confederates, and Ricky guarded them at gunpoint while Gary considered killing them.  (*Id.* at pp. 140, 151.)  Both brothers watched Gary and his cellmate kill the Lyons family without attempting to help the victims before, during, or after.  (*Id.* at p. 151.)  "Far from merely sitting in a car away from the actual scene of the murders acting as the getaway driver to a robbery, [Raymond and Ricky were each] actively involved in every element of the kidnapping-robbery and [were] physically present during the entire sequence of criminal activity culminating in the murder of the Lyons family and the subsequent flight."  (*Id.* at p. 158.)

The brothers' conduct showed their participation in the crime was "major" and their mental state was "one of reckless indifference to human life."  (*Tison*, *supra*, 481 U.S. at p. 158.)  The high court held that combination of conduct and mental state was "sufficient to satisfy the *Enmund* culpability requirement."  (*Ibid.*)

In considering the import of *Enmund* and *Tison*, our Supreme Court in *Banks* observed that capital-eligible felony-murder cases require an individualized assessment of "the defendant's *personal* role in the crimes leading to the victim's death and . . . the defendant's individual responsibility for the loss of life, not just his or her vicarious responsibility for the underlying crime."  (*Banks*, *supra*, 61 Cal.4th at p. 801.)  To

satisfy section 190.2, subdivision (d)'s conduct requirement (major participation), the defendant's "personal involvement must be substantial, greater than the actions of an ordinary aider and abettor to an ordinary felony murder such as Earl Enmund." (*Id.* at p. 802.)  To satisfy the mental state required by section 190.2, subdivision (d) (reckless indifference), the defendant must have ""knowingly engag[ed] in criminal activities known to carry a grave risk of death."' [Citations.]  The defendant must be aware of and willingly involved in the violent manner in which the particular offense is committed, demonstrating reckless indifference to the significant risk of death his or her actions create." (*Id.* at p. 801.)

To help guide the analysis of whether a defendant can be found to have been a major participant in a felony murder, the *Banks* court listed the following questions designed to "distinguish the Tisons from Enmund," noting no individual factor was necessary nor was any one of them necessarily sufficient:  "What role did the defendant have in planning the criminal enterprise that led to one or more deaths?  What role did the defendant have in supplying or using lethal weapons?  What awareness did the defendant have of particular dangers posed by the nature of the crime, weapons used, or past experience or conduct of the other participants?  Was the defendant present at the scene of the killing, in a position to facilitate or prevent the actual murder, and did his or her own actions or inaction play a particular role in the death?  What did defendant do after lethal force was used?" (*Banks, supra*, 61 Cal.4th at p. 803, fn. omitted; see also *id.* at p. 803, fn. 5 ["In cases where lethal force is not part of the agreed-upon plan, absence from the scene may significantly diminish culpability for death"].)

Applying the foregoing factors to Matthews's case, the *Banks* court concluded he was not a major participant. There was no evidence Matthews planned the robbery, obtained the guns used in its commission, knew his confederates had killed before, or was present at the scene of the robbery and killing. (*Banks*, *supra*, 61 Cal.4th at p. 805.)

Our Supreme Court further held Matthews did not exhibit a reckless indifference to human life. (*Banks*, *supra*, 61 Cal.4th at p. 807.) In the court's view, *Enmund* and *Tison* established that "participation in an armed robbery, without more, does not involve 'engaging in criminal activities known to carry a grave risk of death.' [Citation.]" (*Id*. at p. 805.) Like Enmund, Matthews was "no more than a getaway driver . . . ." (*Ibid*.) There was no evidence Matthews knew the marijuana dispensary was guarded or that the guard might be armed. (*Id*. at p. 811.) He "did not see the shooting happen, did not have reason to know it was going to happen, and could not do anything to stop the shooting or render assistance." (*Id*. at p. 807.) Evidence Matthews may have known he was taking part in an armed robbery was insufficient to show he "*subjectively*" knew "his own actions would involve a grave risk of death." (*Ibid*.)

2.      Clark

Our high court built upon its discussion in *Banks*, with greater emphasis on the requirements of reckless indifference, when it decided *Clark*, *supra*, 63 Cal.4th 522 the following year. The defendant, William Clinton Clark (Clark), was convicted of two murders on an aiding and abetting theory, and the court sentenced him to death on the basis of five special circumstance findings, two of which related to the first murder and three to the

14

second.  (*Id*. at pp. 534-535.)  The *Clark* court concluded the burglary-murder and robbery-murder special circumstance findings that related to the first murder were not supported by sufficient evidence.  (*Id*. at p. 611.)  The facts, in sum, were these.

Nokkuwa Ervin (Ervin) shot the mother of a store employee during an attempted robbery of a CompUSA store.  (*Clark*, *supra*, 63 Cal.4th at p. 535.)  Ervin entered the store after closing time and handcuffed its employees so that his accomplices, including Clark, could remove computers.  (*Id*. at pp. 536, 613.)  While the nighttime robbery was underway, Ervin was apparently taken by surprise when Kathy Lee, the mother of one of the employees, unexpectedly appeared at the store to pick up her son.  (*Id*. at pp. 537, 539.)  Ervin shot and killed her with the single bullet loaded in his revolver.  (*Id*. at p. 537.)  Although Clark was not "in the immediate area where Ervin shot Kathy Lee" (*id*. at p. 614), he drove to the store soon after and fled when he saw a woman on the ground, police cars approaching, and Ervin attempting to escape (*id*. at p. 537).

The *Clark* court found there was substantial evidence Clark "was the mastermind who planned and organized the attempted robbery and who was orchestrating the events at the scene of the crime." (*Clark*, *supra*, 63 Cal.4th at p. 612.)  A factfinder could infer from the evidence presented that Clark's plans called for one of the participants to carry a gun, although the expectation was that it would be unloaded.  (*Id*. at p. 613.)  There was no evidence, however, regarding Clark's "awareness of the past experience or conduct of Ervin, the shooter" or of his "awareness of the particular dangers posed by the crime, beyond his concern to schedule the robbery after the store's closing time." (*Id*. at p. 614.)

15

Our Supreme Court declined to decide whether Clark was a "major participant" for purposes of section 190.2, subdivision (d). (*Clark*, *supra*, 63 Cal.4th at p. 614.)  The court noted it had previously upheld a finding, in *People v. Williams* (2015) 61 Cal.4th 1244, 1281, that a defendant was a major participant despite not being present at the scene of the felony murder where he was "'the founder, ringleader, and mastermind behind' a criminal gang engaged in carjacking" and where he had instructed his subordinates "'that a resisting victim was to be shot.'" (*Ibid.*)  Thus, Clark's absence from the scene of the killing did not necessarily preclude the applicability of section 190.2, subdivision (d).

Even though Clark might qualify as a major participant, the court concluded the jury's robbery-murder and burglary-murder findings were not backed by sufficient evidence that Clark exhibited a reckless indifference to human life.  *Tison* had "held that the necessary mens rea for death eligibility may be 'implicit in knowingly engaging in criminal activities known to carry a grave risk of death.' [Citation.]" (*Clark*, *supra*, 63 Cal.4th at p. 616.)  *Enmund* made clear, however, that a defendant's participation in an armed robbery, without more, was insufficient to show the defendant knew his activities carried a grave risk of death.  (*Id.* at pp. 617-618.)

The *Clark* court recognized there was a "'significant[ ] overlap'" in the requirements for the major participant and reckless indifference elements to section 190.2, subdivision (d). (*Clark*, *supra*, 63 Cal.4th at pp. 614-615, citing *Tison*, *supra*, 481 U.S. at p. 153.)  To focus the analysis that must be undertaken to decide the sufficiency of proof of reckless indifference, the *Clark* court highlighted a number of factors that warrant consideration:

16

the defendant's knowledge of weapons, and the use and number of weapons; the defendant's proximity to the crime and opportunity to stop the killing or aid the victim; the duration of the offense conduct, that is, "whether a murder came at the end of a prolonged period of restraint of the victims by defendant"; the defendant's awareness his or her confederate was likely to kill; and the defendant's efforts to minimize the possibility of violence during the crime. (*Id.* at pp. 618-623.)

Applying these factors in Clark's case, the court concluded there was insufficient evidence Clark was recklessly indifferent to human life. The crime involved only one gun, holding just one bullet, and it was carried by Ervin, not Clark. (*Clark*, *supra*, 63 Cal.4th at p. 619.) Clark was not physically present when Ervin killed Kathy Lee and was therefore unable to intervene. (*Ibid.*) Nor was there evidence Clark instructed Ervin to kill, or that he knew Ervin was predisposed to be violent. (*Id.* at pp. 619, 621.) Finally, Clark planned for the robbery to take place after the store closed, and the gun was not supposed to be loaded (*id.* at pp. 620-622)—two facts that evinced some intent to avoid loss of life rather than a reckless obliviousness to homicide. In sum, the court believed there was "nothing in [Clark's] plan that one can point to that elevated the risk to human life beyond those risks inherent in any armed robbery." (*Id.* at p. 623.)

3.      *The sufficiency of the evidence to support the jury's special circumstance finding in this case*

We now apply the principles set forth in *Banks*, *Clark*, *Enmund*, and *Tison* to defendant's claim on habeas. "The standard of review for a sufficiency of the evidence claim as to a special circumstance is whether, when evidence that is

17

reasonable, credible, and of solid value is viewed 'in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the allegation beyond a reasonable doubt.' [Citations.] The standard is the same under the state and federal due process clauses. [Citation.] We presume, in support of the judgment, the existence of every fact the trier of fact could reasonably deduce from the evidence, whether direct or circumstantial. [Citation.]" (*Clark, supra,* 63 Cal.4th at p. 610.)

Considering the "totality of the circumstances" derived from the evidence presented in defendant's trial (*Banks, supra,* 61 Cal.4th at p. 802), we conclude the robbery-murder special circumstance finding must be vacated. On the continuum of culpability for felony-murder defendants, defendant (who was not the actual killer and was not shown to have harbored an intent to kill) is decidedly closer to Enmund, Matthews, and Clark than he is to the Tison brothers.[4]

---

[4] When the *Banks* court considered the "spectrum of culpability" described in *Enmund* and *Tison*, it maintained those cases did not represent a ceiling or floor for determining when an aider and abettor felony-murder defendant was eligible for capital punishment or life imprisonment without parole. (*Banks, supra,* 61 Cal.4th at p. 811.) Thus, the fact a particular defendant may appear more culpable than Enmund does not automatically make him death eligible. (*Ibid.*) Nor must a defendant be as culpable as Raymond or Ricky Tison for section 190.2, subdivision (d) to apply. (*Ibid.*) The question is one of degree, and for reasons we explain, the balance for defendant strongly tips toward the non-liability end of the spectrum.

18

Like *Clark*, there is evidence defendant was the "mastermind" behind the robbery that resulted in Franco's death. Tate testified the robbery was defendant's plan, and the jury could certainly conclude defendant received a larger share of the robbery proceeds than Tate. At the same time, defendant is similar to Clark and Enmund (and Matthews) in mitigating respects: He was not present at the scene of the killing and therefore had no opportunity to thwart it or assist the victim. The gun used in the crime was supplied by Patton, not defendant, and there was no evidence defendant believed Tate or Patton had killed in the past (unlike the Tison brothers' knowledge of Gary Tison and his cellmate's history).

But again like *Clark*, we need not determine whether defendant's planning activity sufficed to make him a major participant under section 190.2, subdivision (d) because we are convinced the evidence was insufficient to show defendant acted with a reckless indifference to human life.

As instructed by *Clark*, we consider defendant's knowledge of weapons used in the crime, and their actual use and number; defendant's proximity to the crime and opportunity to stop the killing or aid Franco; the duration of the crime; defendant's knowledge of Tate's propensity to kill; and defendant's efforts to minimize the possibility of violence during the crime.

Here, there was no evidence defendant knew a gun would be used in the robbery. The gun Tate used apparently belonged to Patton, and Tate said he would not have used it had Saravia exited the van alone. In the previous robberies Tate testified to committing with defendant, a fake gun had been used in one and there was no evidence a gun had been used in the other. Defendant was aware that Patton had carried a gun and

19

accidentally shot himself in one of the numerous follow-home robberies committed in the past, but that says nothing about defendant's knowledge Tate would be given (and use) a gun in the robbery of Saravia. Thus, evidence of defendant's awareness a gun would be used was less than that established in *Clark*, where the defendant knew an operable firearm would be used, even though it was supposed to be unloaded.

Defendant was also absent from the scene of the killing, and therefore had no opportunity to stop it or to help Franco. This is another respect in which the evidence of reckless indifference here was weaker than in *Clark* (where the defendant was found ineligible for a special circumstance finding)—Clark appeared at the scene soon after the killing and was conceivably in a position to aid the victim.

The duration of the crime also counsels against finding defendant exhibited reckless indifference to human life. Tate's killing of Franco appeared to be somewhat impulsive, much like the shootings in *Banks* and *Clark*; all three shootings occurred when the shooter was unexpectedly confronted. In *Banks*, the security guard was shot when he was pushing on the front door of the establishment from the outside in an attempt to keep the robbers inside. (*Banks*, *supra*, 61 Cal.4th at p. 795; see also *id.* at p. 807 [observing that the shootings in that case and in *Enmund* were both apparently spontaneous, in contrast to the killing of the Lyons family in *Tison*].) In *Clark*, the shooter was surprised by the arrival of a store employee's mother. (*Clark*, *supra*, 63 Cal.4th at p. 539.) In this case, Tate seemed not to expect Franco would go after him. Tate testified the shooting was accidental, and that he fired the gun because he got scared. *Tison* starkly contrasts with these three cases. Ricky and Raymond Tison

20

intentionally lured the Lyons family into a trap, drove them into the desert, stood guard as they pleaded for their lives and Gary contemplated aloud whether to kill them, and watched as the victims were shot. (*Tison*, *supra*, 481 U.S. at pp. 140-141.)

Even though defendant and Tate belonged to the same gang and had committed follow-home robberies together in the past, "[n]o evidence indicated [defendant and Tate] had ever participated in shootings, murder, or attempted murder . . . ."[5] (*Banks*, *supra*, 61 Cal.4th at pp. 810-811.) In one of the two prior robberies Tate described committing with defendant, a fake gun was used. In the other, the victim was a woman, and evidence indicated defendant and his associates did not carry guns when they robbed women. The prosecution's gang expert testified the 4-Deuce Crips's primary activities were robberies and narcotics; murder or attempted murder were not on the expert's list of crimes often committed by the gang.[6]

---

[5] A witness who personally knew Patton, Tate, and defendant told police in an interview during the investigation that she knew Tate "to be a killer" and knew "of him shooting up places." At trial, the witness said she did not recall making those statements and they were untrue in any event. She maintained she did not know Tate killed or was likely to kill anyone, and explained she may have told the police otherwise based on "rumors," because Tate "st[ood] his own ground," and because of "the way he carr[ied] guns and he was so young." Tate testified he had never shot a .38 caliber revolver before he shot Franco.

[6] The expert testified the gang resorted to violence to protect their territory from "rival gangs" and "rival narcotics dealers." The victim in this case and in other follow-home robberies were obviously not rival gang members.

21

The evidence that Tate regularly used PCP, including on the day he killed Franco, also cannot support a reasonable inference defendant knew Tate was likely to kill. For one thing, and as we have already discussed, there was no evidence defendant even knew Tate would be armed during the Saravia robbery. In addition, there was no expert testimony at trial about the effects of PCP; Tate himself testified the drug made him "a little slow" or "relaxed," which would not support an inference he was more prone to kill.

Considering all the evidence against defendant, "there appears to be nothing in the plan that one can point to that elevated the risk to human life beyond those risks inherent in any armed robbery." (*Clark*, *supra*, 63 Cal.4th at p. 623; compare, e.g., *In re Loza* (2017) 10 Cal.App.5th 38, 50 [even if defendant believed killer was joking when he said he had shot someone in the head prior to defendant arming him to commit robbery, the killer's statement "at the very least revealed that [the defendant] with eyes wide open embarked upon an armed robbery with the type of cohort who callously bragged about having shot another human being moments earlier"].) Like the defendant in *Banks*, defendant here "did not see the shooting happen, did not have reason to know it was going to happen, and could not do anything to stop the shooting or render assistance." (*Banks*, *supra*, 61 Cal.4th at p. 807.) He was not "aware of and willingly involved in the violent manner in which the particular offense [was] committed . . . ." (*Id.* at p. 801.) Under *Banks* and *Clark*, the evidence of defendant's individual culpability was insufficient to support the special circumstance finding that resulted in a sentence of life in prison without the possibility of parole.

### B.    *The Attorney General's Procedural Arguments*

Although we conclude the evidence cannot support a special circumstance finding, we must separately assess whether the Attorney General's procedural arguments bar relief.  The Attorney General contends defendant's petition should be denied because his argument was previously considered and rejected on direct appeal and because claims of insufficient evidence are not cognizable in a habeas corpus petition.  The Attorney General further contends *Banks* and *Clark* do not apply, as his brief puts it, "retroactively."  Each of these arguments is unconvincing, for reasons we now explain.

We begin with an overarching, dispositive point: Federal due process guarantees require reversal of the special circumstance finding in this case regardless of the Attorney General's California-law-based procedural arguments.  That much is clear from the United States Supreme Court's decision in *Fiore v. White* (2001) 531 U.S. 225 (*Fiore*).  There, the high court considered whether Fiore was entitled to habeas corpus relief when—after  his conviction—the Pennsylvania Supreme Court interpreted the relevant penal statute in a manner that made clear Fiore's conduct was not within its scope.  (*Id.* at p. 226.)  In response to a certified question from the high court, the Pennsylvania Supreme Court stated its interpretation of the statute "'did not announce a new rule of law'" but rather "'merely clarified the plain language of the statute.'"  (*Id.* at p. 228.)  With that answer in hand, the United States Supreme Court recognized Fiore's case "present[ed] no issue of retroactivity" and instead raised only the question of "whether Pennsylvania can, consistently with the Federal Due Process Clause, convict Fiore

23

for conduct that its criminal statute, as properly interpreted, does not prohibit." (*Ibid.*)

The high court's answer, unanimously, was "no." The court held "the Due Process Clause of the Fourteenth Amendment forbids a State to convict a person of a crime without proving the elements of that crime beyond a reasonable doubt." (*Fiore*, *supra*, 531 U.S. at pp. 228-229 [citing *Jackson v. Virginia* (1979) 443 U.S. 307 and *In re Winship* (1970) 397 U.S. 358].) Thus, in *Fiore*'s words, "[t]he simple, inevitable conclusion is that Fiore's conviction fails to satisfy the Federal Constitution's demands." (*Fiore*, *supra*, at p. 229.)

The parallels to our case are exact, and the result must be identical. Like the Pennsylvania Supreme Court's opinion at issue in *Fiore*, our Supreme Court's opinions in *Banks* and *Clark* merely clarified the meaning of section 190.2—*Banks* and *Clark* merely clarified the "major participant" and "reckless indifference to human life" principles that existed when defendant's conviction became final. The Federal Constitution therefore requires reversal of the special circumstance finding against defendant, and the Attorney General's procedural arguments can be no match for the United States Constitution's demands.

Felicitously, though, California law in fact stands in harmony with Federal due process principles. The decisions of the courts of this state invoked by the Attorney General—when correctly understood—pose no bar to relief.

What is known as the *Waltreus* rule[7] provides that "legal claims that have previously been raised and rejected on direct appeal ordinarily cannot be reraised in a collateral attack by

---

[7] *In re Waltreus* (1965) 62 Cal.2d 218 (*Waltreus*).

filing a petition for a writ of habeas corpus." (*In re Reno* (2012) 55 Cal.4th 428, 476 (*Reno*).) The rule is venerable, but it has no application in the unusual circumstance here where our Supreme Court has revisited the meaning of a penal statute. *Banks* and *Clark* are correctly understood to have clarified the plain textual requirements of section 190.2 that have existed since the statute's inception, and so understood, section 190.2 went unsatisfied by the proof at defendant's trial and the resulting sentence must be vacated regardless of our prior determination of defendant's appeal. We concede this view of *Banks* and *Clark* is subject to the criticism that it relies on what some have called a legal fiction, namely, that our Supreme Court's recent decisions declared (or, more colorfully, unearthed) the always-existing meaning of the statute. But years ago, in *People v. Mutch* (1971) 4 Cal.3d 389 (*Mutch*), our Supreme Court rejected precisely that mode of criticism in favor of a result akin to the result we reach here.

The defendant in *Mutch* collaterally attacked the validity of his aggravated kidnapping convictions based on a case decided only after the convictions had become final, *People v. Daniels* (1969) 71 Cal.2d 1119 (*Daniels*). *Daniels* construed the kidnapping statute of conviction to require proof of asportation that had not been adduced at Mutch's trial, and our Supreme Court held his challenged convictions must accordingly be vacated. (*Mutch, supra,* 4 Cal.3d at pp. 393-394, 399.) The dissent in *Mutch* engaged in an extended discussion of common law retroactivity principles and criticized the result reached by the majority—believing it depended on the "fiction or myth" that a decision like *Daniels* that changed the prevailing understanding of the law was not "new law" but rather a

25

discovery of what was, and theretofore had been, the true law. (*Id.* at p. 403 (dis. opn. of Burke, J.).)

The majority rejected the dissent's view and explained Mutch was entitled to rely on *Daniels* without need of resorting to an analysis of whether the decision was "retroactive." (*Mutch, supra*, 4 Cal.3d at p. 394.) In the majority's view, *Daniels* "did not overturn a judge-made rule of common law" and "did not change any . . . evidentiary or procedural rules . . . ." (*Id.* at pp. 394-395.) Rather, *Daniels* simply "recognized a statutory rule . . . to which courts had not previously given appropriate effect" (*id.* at p. 394); in other words, "'*what* [Mutch] *did was never proscribed under* [the aggravated kidnapping statute]'" (*id.* at p. 396).[8] The *Mutch* court accordingly held "finality for purposes of appeal [was] no bar to relief" because habeas corpus (and other extraordinary remedies) are available in a case where a court acts in excess of its jurisdiction by imposing a punishment for conduct not prohibited by the relevant penal statute. (*Mutch, supra*, at p. 396.)

---

[8] Our Supreme Court reiterated the same principle more recently in *Woosley v. State of California* (1992) 3 Cal.4th 758: "'To determine whether a decision should be given retroactive effect, the California courts first undertake a threshold inquiry: does the decision establish a new rule of law? If it does, the new rule may or may not be retroactive . . . ; but if it does not, "no question of retroactivity arises," because there is no material change in the law. [Citations.]' [Citation.] An example of a decision which does not establish a new rule of law is one in which we give effect 'to a statutory rule that the courts had theretofore misconstrued ([ ]*Mutch*[, *supra*,] 4 Cal.3d [at p.] 394) . . . .' [Citations.]" (*Id.* at p. 794.)

*Banks* and *Clark* are the equivalent of *Daniels* in *Mutch*. For purposes of legal analysis, *Banks* and *Clark* did not create new law; they simply state what section 190.2, subdivision (d) has always meant. And that means defendant's life without parole sentence was not authorized by section 190.2 and the *Waltreus* rule does not bar defendant's habeas corpus claim.

Nor is defendant's claim prohibited by the rule set forth in *Lindley*[9] against permitting habeas corpus review of "routine claims that the evidence presented at trial was insufficient . . . ." (*Reno, supra,* 55 Cal.4th at p. 505.) In *Lindley*, a petitioner sought habeas corpus relief on the ground that various trial witnesses had lied under oath or lacked credibility. Our Supreme Court found that while some of the testimony showed "serious conflicts and unexplainable discrepancies," the evidence did not establish perjury. (*Lindley, supra,* 29 Cal.2d at p. 723.) Absent a finding of perjury, the existence of testimony that was "uncertain, questionable or directly in conflict with other testimony [did] not afford a ground for relief upon habeas corpus" because "all of [the] discrepancies and any probable falsehoods [in the testimony] relate[d] to issues of fact or matters of defense, and were, or could have been, brought to the attention of the jury." (*Id.* at pp. 722, 724.)

Defendant's claim that the evidence presented against him failed to support the robbery-murder special circumstance (and therefore a sentence of life without the possibility of parole) is not a "routine" claim of insufficient evidence as described in *Lindley*. His claim does not require resolution of disputed facts; the facts are a given, they are just legally insufficient under section 190.2

---

[9] *In re Lindley* (1947) 29 Cal.2d 709 (*Lindley*).

27

as elucidated in *Banks* and *Clark*.  Defendant's assertion of error, therefore, falls outside the limitation on insufficient evidence claims described in *Lindley*.  (See *In re Harris* (1993) 5 Cal.4th 813, 840-841 [habeas relief unavailable if the reviewing court must "reopen factual issues already sifted, evaluated, and decided at trial" but appropriate "where such review does not require a redetermination of the facts, and thus poses a strictly legal issue"].)

## DISPOSITION

The petition for habeas corpus is granted.  The true finding on the robbery-murder special circumstance allegation under section 190.2, subdivision (a)(17)(A) is vacated.  The matter is remanded with directions to resentence defendant consistent with the views expressed in this opinion.

**CERTIFIED FOR PUBLICATION**


BAKER, J.


We concur:


KRIEGLER, Acting P.J.          LANDIN, J.[*]

---

[*]     Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.