Filed 12/30/24  P. v. Dyer CA1/4

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>ALFRED DYER,<br><br>        Defendant and Appellant. | A167691<br><br>(Alameda County<br>Super. Ct. No. 72504) |

Alfred Dyer appeals from the trial court's denial of his petition for resentencing pursuant to Penal Code section 1172.6, contending that there was insufficient evidence to prove him guilty of felony murder under a currently valid theory.[1]  Dyer was initially convicted of murder, attempted murder, and kidnapping after he and two codefendants drove four people to a remote location where they shot and killed two of them and injured the other two.  After his convictions were overturned, he pled guilty to two counts of second degree murder.  In 2019, he petitioned for resentencing.  At the resentencing hearing, the parties and the court relied on the 1981 preliminary hearing testimony of a forensic pathologist and of the two

_____

[1] Undesignated statutory references are to the Penal Code.

surviving victims, Belinda Murray[2] and Bennie Warren, and on Warren's 1991 declaration submitted in support of Dyer's petition for habeas corpus challenging his death sentence. The trial court found portions of Warren's declaration less credible than his earlier testimony, and, after reviewing the factors in *People v. Banks* (2015) 61 Cal.4th 788 (*Banks*) and *People v. Clark* (2016) 63 Cal.4th 522 (*Clark*), concluded the prosecution had proven beyond a reasonable doubt that Dyer was guilty of felony murder.

Dyer contends that substantial evidence does not support the trial court's finding under *Banks* and *Clark* that he was a major participant in the kidnappings who acted with reckless indifference to human life pursuant to section 189, subdivision (e). The Attorney General disagrees, and alternatively argues that there was substantial evidence to support a finding that Dyer was a direct aider and abettor of the murders who acted with implied malice pursuant to section 188, subdivision (a)(3). We affirm.

## BACKGROUND

### I. Factual History

Belinda testified that around 9 p.m. on November 8, 1980, Dyer, Belinda, Floyd, Nora Fluker, Michael Jackson (Dyer's brother), and Cleveland Ario were at Belinda's home, some of them drinking wine. When Dyer arrived, he brought cocaine with him, which he, Ario, and Belinda injected intravenously. Six children were at the home. Dyer had a .38-caliber gun and Ario a .45-caliber gun with them, but things were friendly. Warren came over at 9:30 or 10 p.m. They were talking and then around 11 p.m., Dyer, Jackson, and Ario left.

---

[2] We refer to Belinda and her brother, Floyd Murray, by their first names.

2

When Dyer, Jackson, and Ario returned about two hours later, they were upset from an argument. They all went upstairs and Dyer lay down across Belinda's bed and dozed off with his gun in his hand. Warren, and then Ario and Jackson, left. Dyer woke up and asked Belinda if Jackson had taken his rings. Belinda said she did not know. Dyer thought Warren might have taken the rings and said, "Belinda, come walk down here to this project because if I see [him] I am going to kick his ass or kill him." They got dressed, Dyer gathered the two guns, and they looked for Warren but did not find him. Belinda thought Warren might have sold the rings at a nearby dope house.

They returned to Dyer's apartment. Warren knocked on the back door, and either Belinda or Dyer opened the door. Dyer "snatched" Warren inside and began hitting him in the temple area of his head with the two guns, telling him, " 'Give me my rings.' " Warren said, " 'I don't have your ring[s], what are you talking about?' " Belinda was calling Fluker, telling her to come downstairs and help stop Dyer. She encouraged Warren to return the rings if he had them. Warren was bleeding and did not fight back. Dyer told Warren, " 'You better pray . . . that my brother has my ring[s]—if he don't, you are a dead man.' "

Jackson and Ario returned and Belinda and Fluker went outside to ask if they had Dyer's rings. They all returned to the house where they started "loud talking." Dyer handed Belinda the .38 and Jackson the .45. Dyer said Warren was "dead," and Ario responded, "If you kill one, you've got to kill everybody." Dyer said, "I am not going to kill no babies."

Belinda did not recall whether it was Ario or Dyer who suggested they gather everyone and put them in the car. Ario went upstairs and got Floyd, who had been asleep. Ario pushed Floyd down the stairs. Dyer and Warren

3

were in the kitchen; Warren was "trying to shake the blood off," while Jackson told everyone to "go get in the car." Jackson pushed Belinda and started escorting everyone to his car. Dyer brought Warren to the car; Warren got in first. Fluker got in next and then Floyd did, followed by Belinda. Jackson was behind Belinda, with the gun on her. Warren, Fluker, Floyd, and Belinda, in that order, were all in the backseat. In the front, Ario was in the driver seat, Dyer was in the middle, and Jackson was in the passenger seat.

Jackson and Dyer had their guns in the car, Jackson the .45 and Dyer the .38. Ario, Jackson, and Dyer were talking in the front seat, but Belinda did not know what they were saying. Every so often, Jackson would turn around and tell the people in the back to shut up. Ario also told Belinda to shut up and said to the others in the front, " 'Kill that bitch first.' " When Belinda asked why her first, Ario responded that Belinda and another woman had sent his brother to prison. Dyer had the .38 in his hand and would turn around and look at Warren, but did not say anything.

They drove for about 20 minutes up into the hills. Ario asked, " 'Is this spot cool?' " Someone responded, " 'Yes, this is cool.' " They stopped the car, and Jackson opened his door and told Belinda to get out and lie down. It was dark, but Belinda could see a circular area of dirt where she lay face down. Jackson's gun was right in front of her. Floyd lay down next to her.

Belinda heard a gun go off, saw the fire of the bullet coming, threw her arm up, and fainted. When Belinda woke up, someone had picked up her arm and said, " 'Man, this bitch is not dead.' " Someone else said, " 'Man, let's get out of here.' "

Belinda heard the car skid as it drove away, and then Warren calling to her. Warren told her she "better get up and out of here and run for help."

4

Belinda called to Floyd and Fluker, and when she found Floyd, face down, he mumbled to her. Fluker "never moved or said anything." Warren told Belinda "to run one way and he'd go the other way." She first ran down toward the highway, but then went to a house for help. Belinda's jaw was broken and she was hospitalized for more than two weeks; afterward, she had scars on her head, neck, shoulder, wrist, and arm.

Warren testified mostly consistently with Belinda's testimony, but after being pistol-whipped, things were blurry and he "was just about unconscious." Dyer made him, Belinda, Fluker, and Floyd go out to the car at gunpoint. Dyer had the .45; Jackson had the .38. Warren was seated on the driver side, directly behind Ario. Dyer and Jackson had their guns pointed toward the backseat.

After the car stopped, Dyer and Jackson continued to point their guns at the four victims as they got out of the car and walked 15 or 20 feet away. Warren could feel someone behind him but because it was dark he did not know who it was. A voice told them to lie face down on the ground. Warren could see Dyer walk toward him when he looked up from the ground, but could "[n]ot really" see Jackson and did not see Ario.

Warren heard two or three gunshots near Belinda and Floyd, followed by 30 seconds and talking, and then two or three more shots. Between the two sets of shots, Warren heard someone say, "This bitch ain't dead yet." He could not tell who spoke and he did not know who fired the gunshots.

After the second set of shots, Warren heard footsteps and looked up to see Dyer walking toward him and Fluker. He heard three more shots, two that hit Fluker and one that hit him; Dyer had shot them.

Warren recalled waking up a couple hours later, lying on the ground next to Fluker, who he could tell was dead. Belinda was gone and Warren

5

found out later that Floyd was in the bushes. Warren walked down to the road and saw a policeman coming. He spent three or four days in the hospital, but left before he was supposed to. He had a hole-shaped scar over the inside corner of his right eye.

On cross-examination, Warren testified that he did not use any narcotics that day, including, specifically, cocaine.

Doctor Allan McNie testified as a forensic pathologist. He testified that both Floyd and Fluker had multiple gunshot wounds and died from shock and hemorrhage as a result of those wounds. McNie did not have an opinion on the specific caliber of the bullets used to shoot Floyd and Fluker.

## II. Procedural History

Dyer was initially convicted of two counts of first degree murder, two counts of attempted murder, and four counts of kidnapping, along with enhancements, and sentenced to death. His convictions were reversed by the Ninth Circuit Court of Appeals due to juror misconduct, and in 2001, he pled guilty to two counts of second degree murder.

In 2019, he petitioned for resentencing, citing the precursor to section 1172.6. The trial court denied his petition at the prima facie stage, but this court reversed, concluding that the trial court engaged in impermissible factfinding at the prima facie stage. The matter was remanded to the trial court with directions to issue an order to show cause and hold an evidentiary hearing.

For the evidentiary hearing, the parties relied on the preliminary hearing testimony of Belinda, Warren, and McNie; Warren's declaration submitted in habeas corpus proceedings challenging Dyer's death sentence; and the procedural history set forth in Dyer's direct appeal to the California Supreme Court. His declaration was largely consistent with his preliminary

6

hearing testimony, but also differed in certain respects. Warren declared that he was injected with cocaine and perhaps heroin intravenously with the others at Belinda's, explaining that he had not testified to his drug use earlier because it would have embarrassed his family.

Warren declared that Dyer "looked and acted like a different person" when he returned early in the morning with Jackson and Ario and he continued to look that way on the drive up Redwood Road. After the car stopped, Warren believed Dyer was pointing a gun at him, but "did not see [Dyer] shoot his gun at Belinda or Floyd or [Fluker], although [he] did hear gunshots while [Dyer] was pointing his gun at [him]." Warren had trouble remembering the events of the evening due to his use of drugs and alcohol, and because he had been beaten in the head. Much of his testimony "was based on information provided to [him] in . . . conversations" he had with Belinda and a prosecutor before the preliminary hearing. Warren did not believe Dyer should be executed.

At the hearing on Dyer's petition, the parties argued, and the court considered, the impact of Warren's declaration on his credibility. The court noted the consistencies and inconsistencies between Warren's preliminary hearing testimony and his declaration, and that his declaration was "prepared by a big law firm" as part of a challenge to Dyer's death sentence. The court also noted that although Warren testified "quite compelling[ly]" that he saw Dyer actually shoot some of the victims, he left that "critical fact" out of his declaration. Overall, the court explained, the declaration "d[id]n't move the needle much." The court stated it was "comfortable in denying this petition, finding that the admissible evidence . . . does persuade me beyond a reasonable doubt that [Dyer] does not come within the standards that would

7

allow relief," and that the earlier evidence "remains almost completely untarnished by [Warren's] more recent Declaration."

The court later issued a written order, relying on section 189, subdivision (e)(3) to conclude that Dyer was guilty under current law as a major participant in the kidnappings who acted with reckless disregard for human life. Considering the major participant factors from *Banks*, the court stated that Dyer was "the catalyst for the kidnapping" that led to the murders. Although there was not much direct evidence of planning, there was a discussion between Dyer, Ario, and Jackson, where the three implicitly concluded that if Warren was killed, all the adult witnesses would have to be killed. The three men then followed this apparent plan by forcing the victims into the car, driving them into the hills, instructing them all to lie down, and then shooting them. Dyer was present during the entire course of events and was armed while directing the victims; even if he was not the actual shooter, "his threatening presence and the use of his gun encouraged the four victims to not resist or flee." Nor did Dyer render aid after the shooting, including when the men realized that Belinda was still alive.

As to *Clark*'s reckless indifference factors, the court noted Dyer's knowledge, possession, and use of the two guns at Belinda's home, in the car, and at the murder scene. Dyer was present through the duration of the crimes, starting when he pistol-whipped Warren in Belinda's kitchen. The entire course of the crimes was "quite long" and Dyer did not take any opportunities for restraint. Nor did he appear to reflect or to try to minimize or prevent the crimes. Instead, the court found, "Dyer's only effort was to ensure violence occurred . . . consistent with the theory that the sole purpose of the kidnapping was murder."

8

The court further explained that Belinda's and Warren's preliminary hearing testimony was, overall, credible and consistent with the other evidence. The inconsistency in Warren's testimony and declaration regarding his drug use that night was "peripheral," in the court's view, and there was no significant distinction between his testimony that he saw Dyer shoot him and his declaration statement that he saw Dyer holding a gun when he was shot. Although his declaration statements regarding his poor recollection of the night's events was somewhat problematic, it was probably attributable to his belief that Dyer should not be executed for the crimes. The court found that the prosecution had proven Dyer guilty of murder beyond a reasonable doubt.

## DISCUSSION

### I. Standard of Review

We review for substantial evidence the trial court's finding of guilt after a section 1172.6 evidentiary hearing. (*People v. Reyes* (2023) 14 Cal.5th 981, 988.) We defer to the trial court, reviewing the record in the light most favorable to the judgment and evaluating whether any rational trier of fact could have made the determination the trial court did based on record evidence that is reasonable, credible, and of solid value. (*Ibid.*) We do not resolve credibility or evidentiary conflicts. (*People v. Owens* (2022) 78 Cal.App.5th 1015, 1022.)

### II. Major Participant Who Acted with Reckless Indifference

The trial court concluded that Dyer could be found guilty of felony murder under the current version of section 189, subdivision (e). That provision states, in relevant part: "A participant in the perpetration . . . of a . . . [kidnapping] in which a death occurs is liable for murder . . . if . . . [¶] (3) The person was a major participant in the underlying felony and acted

9

with reckless indifference to human life, as described in [section 190.2, subdivision (d)]."[3] "[T]here is significant overlap 'between the two elements, being a major participant, and having reckless indifference to human life, . . . "for the greater the defendant's participation in the felony murder, the more likely that he acted with reckless indifference to human life." ' " (*In re Bennett* (2018) 26 Cal.App.5th 1002, 1015 (*Bennett*).)

### A. Major Participant

In *Banks*, *supra*, 61 Cal.4th 788, our Supreme Court established the analytical approach to determining whether a defendant was a "major participant." " 'The ultimate question . . . is "whether the defendant's participation in 'criminal activities known to carry a grave risk of death' . . . was sufficiently significant to be considered 'major.' " ' " (*People v. Jones* (2022) 86 Cal.App.5th 1076, 1087 (*Jones*).) Applying *Banks*, we consider the following factors: "What role did the defendant have in planning the criminal enterprise that led to one or more deaths? What role did the defendant have in supplying or using lethal weapons? What awareness did the defendant have of particular dangers posed by the nature of the crime, weapons used, or past experience or conduct of the other participants? Was the defendant present at the scene of the killing, in a position to facilitate or prevent the actual murder, and did his or her own actions or inaction play a particular role in the death? What did the defendant do after lethal force was used? No one of these considerations is necessary, nor is any one of them necessarily sufficient." (*Banks*, at p. 803, fn. omitted.) We conclude that "[s]ubstantial evidence of several factors relating to [Dyer's] role in the [kidnappings]

---

[3] Because section 189, subdivision (e)(3) expressly incorporates the standard set forth in section 190.2, subdivision (d), we consider cases applying the latter provision as part of our analysis. (See *People v. Oliver* (2023) 90 Cal.App.5th 466, 477–479 (*Oliver*).)

supports the conclusion that he was a major participant." (*In re Loza* (2017) 10 Cal.App.5th 38, 49 (*Loza*).)

We agree with the trial court on the first *Banks* factor, that Dyer was the "catalyst" for the kidnappings and eventual murders. Of the three codefendants, Dyer was the one who became angry when he could not find his rings, searched for Warren in the neighborhood after saying he would beat or kill Warren, and then pistol-whipped Warren in Belinda's kitchen. While in the kitchen, he twice stated that Warren was "dead," and when Ario replied that they should kill all the witnesses, Dyer implicitly agreed they should kill the adult witnesses by stating he would not kill the "babies." The trial court reasonably concluded that Dyer, Jackson, and Ario then discussed and planned to forcibly take the adults up into the hills to murder them.

As to the second factor, one of the ostensible murder weapons was Dyer's, and he used the threat of that weapon to help force all four victims into the car and then onto the ground. Dyer also handled the other gun that night and used it to pistol whip Warren, likely leading the others to fear him and thereby contributing to the defendants' ability to carry out their plan.

The third factor—what evidence there was of the nature of the dangers involved in the kidnappings and Dyer's knowledge of the likelihood his codefendants would commit murder—also supports a finding that Dyer was a major participant. Dyer was aware that he and Jackson were wielding guns during the kidnappings and he and the others evidently planned to kidnap the victims and murder them to eliminate witnesses. The kidnappings "transpired in the early morning hours after midnight, in a dark, secluded location where a killing was less likely to be immediately detected," further evidence of the obviously dangerous nature of the codefendants' conduct. (*People v. Montanez* (2023) 91 Cal.App.5th 245, 272 (*Montanez*).) It is

11

therefore reasonable to infer that Dyer was aware of the nature and extent of the particular dangers inherent in the kidnappings.

The fourth and fifth factors also support the trial court's conclusion. Dyer was present through the entire sequence of events, and had an opportunity to prevent the kidnappings, but instead he facilitated them, minimizing the potential harm only by refusing to kill any child witnesses. He rendered no aid at the scene.

The facts of *Loza*, as the Attorney General argues, are analogous to those here. Loza and his codefendants were involved in the early-morning armed robbery of a gas station convenience store that culminated in the shooting and killing of the two store employees. (*Loza*, *supra*, 10 Cal.App.5th at pp. 42–43.) Loza and others were driving around the morning of the murders, when they saw another defendant, Sanford. (*Id.* at p. 42.) As he got into the car, Sanford commented that he had just shot someone in the head; the others thought he was kidding. (*Ibid.*) Sanford had a gun, which he put in the back of the car. (*Ibid.*) While driving around, Loza, Sanford, and the others formulated a plan to rob the convenience store. (*Id.* at pp. 42–43.) When they arrived at the gas station, a third codefendant purchased a small amount of gasoline and then drove to the side of store. (*Id.* at p. 42.) The evidence at trial was mixed as to whether Loza or Sanford was the actual shooter, but other participants' testimony indicated that Loza at least gave Sanford the gun, wrapped a sweater around his head to disguise his identity, and then held the store door open while Sanford demanded money from the employees and shot them. (*Id.* at pp. 43, 44, 51.) After the shooting, all the codefendants fled without rendering aid. (*Id.* at p. 43.) The *Loza* court concluded that there was sufficient evidence to find that Loza fell "squarely" within the role of a major participant. (*Id.* at p. 51.)

12

Here, as in *Loza*, Dyer "played a significant and relatively equal role vis-à-vis the other participants . . . who contributed to what planning was necessary to accomplish" the kidnapping. (*Loza, supra,*. 10 Cal.App.5th at p. 49.) Like Loza, Dyer "personally handled the murder weapon and was responsible [at least] for supplying it to the shooter for use in the [kidnapping]." (*Id.* at p. 50.) If anything, in this case, Dyer took a greater role in the planning and he actually held and pointed the gun at the victims during the kidnapping and the shooting. As in *Loza*, "[w]e also find particularly significant in determining [Dyer's] status as a major participant his physical presence at the scene, involvement in the actual [kidnapping], and inaction either in attempting to prevent the shootings or in assisting the victims." (*Ibid.*) And although there is less evidence here of Dyer's awareness of his codefendants' propensity toward killing, there was more evidence of Dyer's involvement in the relatively extended series of events that preceded the killing, including that Dyer personally pistol-whipped Warren before the kidnapping commenced and said he was "dead." As in *Loza*, it is not critical that Dyer may not have been the actual shooter. (See also *Jones, supra*, 86 Cal.App.5th at p. 1089 [jury's finding personal use of a firearm allegation not true did not prevent defendant from being a major participant; it merely reflected uncertainty or a lack of proof of shooter's identity].)

Dyer's arguments to the contrary are unavailing. He mostly disagrees with the trial court's interpretation of the evidence, and asks us to view it in a different light, but for the reasons above we find that substantial evidence supports the trial court's determination that Dyer was a major participant. (*People v. Saibu* (2022) 81 Cal.App.5th 709, 744.)

## B.     Reckless Indifference

Reckless indifference to human life is " 'implicit in knowingly engaging in criminal activities known to carry a grave risk of death.' " (*In re Scoggins* (2020) 9 Cal.5th 667, 676.)  It " 'encompasses a willingness to kill (or to assist another in killing) to achieve a distinct aim, even if the defendant does not specifically desire that death as an outcome of his actions.' " (*Id. at pp. 676–677.*)  "Reckless indifference to human life has a subjective and an objective element.  [Citation.]  As to the subjective element, '[t]he defendant must be aware of and willingly involved in the violent manner in which the particular offense is committed,' and he or she must consciously disregard 'the significant risk of death his or her actions create.'  [Citations.]  As to the objective element, ' "[t]he risk [of death] must be of such a nature and degree that, considering the nature and purpose of the actor's conduct and the circumstances known to him [or her], its disregard involves a gross deviation from the standard of conduct that a law-abiding person would observe in the actor's situation." ' " (*Id.* at p. 677.)

"We analyze the totality of the circumstances to determine whether [defendant] acted with reckless indifference to human life.  Relevant factors include:  Did the defendant use or know that a gun would be used during the felony?  How many weapons were ultimately used?  Was the defendant physically present at the crime?  Did he or she have the opportunity to restrain the crime or aid the victim?  What was the duration of the interaction between the perpetrators of the felony and the victims?  What was the defendant's knowledge of his or her confederate's propensity for violence or likelihood of using lethal force?  What efforts did the defendant make to minimize the risks of violence during the felony?" (*Scoggins*, *supra*, at p. 677; see *Clark*, *supra*, 63 Cal.4th at pp. 618–622.)

14

Here, Dyer told Warren twice that he was "dead"; inflicted the pistol whipping; ordered the victims to the car at gunpoint; and assisted in ensuring they lay face down. He wielded one of the guns during the shooting, when he pointed it at Warren. Further, even crediting that Jackson was the only shooter—a point on which the evidence was mixed—"it is noteworthy that the shooting was not spontaneous or accidental; rather, [Jackson] made clear his intent to shoot, which afforded [Dyer] the time to observe and react before the murder." (*Loza, supra*, 10 Cal.App.5th at p. 53; see also *Oliver, supra*, 90 Cal.App.5th at p. 483 [finding probative that petitioner was aware that codefendant intended to use firearm to kill victim during robbery].) And as with the major participant analysis, "we find particularly significant in concluding that [Dyer] acted with reckless indifference his physical presence at the scene and his failure to make any attempt to prevent the shootings or assist the victims." (*Loza*, at p. 53.) Indeed, " '[w]here a victim is held at gunpoint, kidnapped, or otherwise restrained in the presence of perpetrators for prolonged periods, "there is a greater window of opportunity for violence" . . ., possibly culminating in murder.' " (*Montanez, supra*, 91 Cal.App.5th at p. 283.) And statements by a codefendant, like Ario, expressing a current intent to murder support a finding of liability. (See *id.* at pp. 272, 273, 282; see also *id.* at pp. 273–274, 283–284 [motive to kill victims to avoid detection supports finding of reckless indifference].)

The cases Dyer cites in support of his arguments are readily distinguishable. (See *Bennett, supra*, 26 Cal.App.5th at pp. 1019–1021, 1023–1027 [although defendant participated in planning robbery and acted as a driver, he did not supply or hold a gun; he was not physically present at shooting; and the incident was short in duration]; *In re Ramirez* (2019) 32 Cal.App.5th 384, 404–406, 408, fn. 12 [defendant was not armed, not

15

physically involved in shooting, and functioned primarily as getaway driver]; *In re Miller* (2017) 14 Cal.App.5th 960, 974–976 [defendant participated in planning robbery, but acted as a lookout and did not supply the gun or physically participate in the shooting].) As was true in a related context, the parties here have not cited a single case, and we have found none, where a "defendant actively participated in a [kidnapping], wielded a firearm during that [kidnapping], and was present for the shooting, but an appellate court found insufficient evidence to support a finding that the defendant acted with reckless indifference for human life." (*People v. Bradley* (2021) 65 Cal.App.5th 1022, 1035–1036.) Substantial evidence supports the trial court's finding that Dyer acted with reckless indifference to human life.

## III.   Direct Aider and Abettor Who Acted with Implied Malice

The Attorney General urges us to consider affirming on an alternate ground—namely, that Dyer was a direct aider and abettor who acted with implied malice. Because substantial evidence supports the trial court's determination that Dyer was a major participant who acted with reckless indifference, we need not reach this alternate ground for liability.

## DISPOSITION

The judgment is affirmed.

                                             GOLDMAN, J.


WE CONCUR:

BROWN, P. J.
SIMONDS, J. *

---

* Judge of the Superior Court of Sonoma County, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.