Filed 12/16/21  P. v. Shyne CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E073641 |
| v. | (Super. Ct. No. FWV900584) |
| LARRY DARNELL SHYNE, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  Stephan G. Saleson, Judge.  Reversed.

Doris M. LeRoy, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, A. Natasha Cortina and Lynne G. McGinnis, Deputy Attorneys General, for Plaintiff and Respondent.

# I.

## INTRODUCTION

A jury convicted defendant and appellant, Larry Shyne, of first degree felony murder (Pen. Code, § 187, subd. (a); count 1)[1], first degree burglary in the presence of another person (§ 459; count 2), and attempted first degree robbery (§ 221, 664; count 3). The jury found that all three crimes had been committed for the benefit of, at the direction of, or in association with a criminal street gang (§ 186.22, subd. (b)(1)(c)), that a principal had used a handgun (§ 12022.53, subds. (b) & (e)(1)), that a principal discharged a handgun (§ 12022.53, subds. (c) & (e)(1)), and that a principal discharged a handgun causing death (§ 12022.53, subds. (d) & (e)(1)). The trial court sentenced Shyne to prison for two 25 years to life terms, plus 17 years, four months. One of the 25-year-to-life terms was imposed for the jury's true finding on the firearm enhancement.

Shyne filed a petition under section 1170.95 to vacate his felony murder conviction and to be resentenced. He also asked the trial court to strike a firearm enhancement. The trial court denied the petition, finding that Shyne did not qualify for relief under section 1170.95 because he was a major participant in the underlying offense and acted with reckless indifference to human life. The court also denied Shyne's request to strike the firearm enhancement imposed for his felony murder conviction.

---

[1] Unless otherwise indicated, all further statutory references are to the Penal Code.

Shyne appeals. We conclude Shyne did not act with reckless indifference to human life and therefore the trial court should have granted his section 1170.95 petition. We therefore reverse and remand with directions to grant Shyne's section 1170.95 petition, vacate his felony murder conviction, and resentence him accordingly. Finally, we remand the matter so the trial court can exercise its discretion as to whether to impose the firearm enhancement imposed on counts 2 and 3, which the trial court stayed under section 654.

II.

FACTUAL AND PROCEDURAL BACKGROUND

A. *Facts*[2]

Shyne's cousin testified and/or told the police[3] that he and fellow 87th Street gang member, McClane, were always together and at the time of the crimes, were living around the corner from each other in Pomona. He did not know the victim. Shyne had seen his cousin and McClane together "a lot."

On December 19, 2008, Shyne called his cousin at their grandmother's home and said he wanted the cousin and McClane to do a robbery that day. Shyne said that he had been to the victim's motel suite the day before and she had been getting money from

---

[2] The facts are taken from our prior unpublished opinion affirming defendant's convictions and sentence. (See *People v. Shyne* (Jan. 21, 2015, E055088) [nonpub. opn.].)

[3] Citations to Exhibit 178 herein are to the cousin's interview with police, so that the reader may see the consistencies between that statement and the cousin's trial testimony.

prostituting herself. Shyne explained that his cousin doing the robbery would be good because the latter had just gotten out of prison and had no money for Christmas gifts.[4] Shyne told his cousin that the victim put money in an unlocked safe all the time. The safe was behind the picture in the bedroom, over the bed, in her motel suite. During his interview with police, Shyne's cousin lied and said it wasn't Shyne, but one of Shyne's pimp partners who had put the cousin up to the robbery, because he wanted to protect Shyne, who was family.[5] Shyne wanted his cousin to call the cousin's friend, McClane, and Shyne asked where the latter was. Either Shyne's cousin called McClane and ran the plan for the robbery by him and McClane agreed to it, or the cousin called McClane and told him that Shyne had something for him and he should call Shyne. Shyne had seen McClane's facial tattoos when he would see his cousin and McClane together before the crimes. Shyne picked his cousin up, then telephoned the victim, called her a punk, and she hung up on him. Shyne then picked McClane up at McClane's house at 5:00 or 6:00 p.m. and drove his cousin and McClane to the victim's motel in his Cadillac, although the cousin had lied to the police and said it was a Corolla. McClane was "amped up." Shyne told them that the victim, who was a prostitute, had a number of valuables in her motel suite that she had purchased as Christmas presents and he wanted her laptop computer,

---

[4] Shyne had also just gotten out of prison, but he did not need money and had several cars.

[5] Indeed, during his lengthy interview with the police, the cousin spent hours trying to cover for Shyne, before finally admitting the latter's involvement.

4

but McClane and Shyne's cousin could have any jewelry and money she had. Shyne told them the victim's suite number.[6] The cousin and McClane were told that there were thousands of dollars in the victim's motel suite. Shyne told them that the victim was a punk and they were to "rough her up" a bit and she would give them what they wanted. Shyne's cousin assumed that the victim kept track of her customers on her laptop and that Shyne wanted it so he could give their contact information to the prostitutes who were working for him at the time. Although Shyne was not then working, he was making money off the prostitutes for whom he pimped. Shyne instructed his cousin and McClane to call the victim and say that they had seen her ad on Craigslist and ask her if she "does Greek."[7] McClane called the victim, using the phone number either Shyne had given him or which was in the victim's Craigslist ad, to which Shyne had directed him. He spoke to her via speakerphone in the presence of Shyne's cousin and Shyne, asking her if she "did Greek" and how much it would cost for the whole night. The victim set up several times for the two to meet at the motel, saying she had customers. After about four calls from McClane, a time was finally set. The victim said she was ready and the three went to the motel and Shyne parked his car on the street next to it. Shyne had shown his cousin and McClane earlier the best way to get in and out of the motel and he said that he would drive around while they were inside and pick them up when they came out. Shyne did

---

[6] In his statement to the police, he said that the victim gave McClane her suite number during one of their pre-pick up calls.

[7] This is a reference to anal intercourse.

5

not go in because the victim knew him. Shyne dropped his cousin and McClane off out of sight of the motel's surveillance cameras and took off. Shyne's cousin and McClane entered the front doors of the motel, saw no one at the front desk, and went to the elevators, where they put on gloves because they were both on parole and didn't want their fingerprints left in the suite in case the victim called the police. After they checked the exit door Shyne had previously told them to use, they went to the victim's suite. McClane told Shyne's cousin to go in first because he did not have tattoos on his face like McClane did.

The victim, who was naked under her opened robe, opened the door just as Shyne's cousin was about to knock. The victim told the cousin that she heard him and McClane coming. Shyne's cousin believed that the room safe had been left open, so his objective was to find it. He walked past the victim and into the bedroom of the suite to find the safe, and while there, he heard McClane with the victim on the living room couch, saying to the victim, "Shut up," "bitches" and "Where's the money?" He also heard the sound of McClane slapping the victim. Shyne's cousin checked behind the picture in the bedroom,[8] but there was no safe. The cousin lifted up the mattress on one side, unsuccessfully looking for money or valuables. He found nothing worth taking and no safe. He did not see a laptop, although there was one in the living room. The cousin

---

[8] The case agent and a forensic specialist, both of whom examined the scene after the crimes, testified that there was no picture in the bedroom. The jury was shown pictures of the bedroom.

was supposed to serve as a lookout, so he proceeded to the front door of the suite.[9]

Although he gave conflicting accounts of this, he said he saw McClane dump out the victim's purse on the couch. He heard the victim say, "What money? What are you talking about?" to McClane. McClane hit the victim again and repeated his question about where the money was. The victim repeated what she had said before, getting louder. McClane told her to shut up, she got quiet, then he asked her again where the money was, and she said, loudly, "What money? What are you talking about?" McClane angrily told the victim to shut up, pulled out a chrome handgun, which Shyne's cousin had not known McClane had, and fired without aiming. The victim said, "What the fuck?" and the cousin and McClane fled the suite. They had been there for less than two minutes. Neither McClane nor Shyne's cousin took anything from the suite. The cousin asked McClane why he had shot the victim and McClane said it was an accident. They went out of the motel as Shyne had instructed them. Shyne's cousin gave conflicting accounts of what became of the gun. Following Shyne's direction, McClane tried to call Shyne on his cell phone, but was not able to reach him. As McClane hung up the phone, Shyne pulled up in his car and picked them up.

Just after the cousin and McClane got into Shyne's car, and in response to his inquiry, Shyne was told that the victim had been shot and, the cousin told him that he did not see a laptop. Shyne told them that they should have taken the victim's cell phone,

---

[9] He gave conflicting accounts of how open the door to the victim's suite was at the time.

which the cousin assumed was because it contained the phone numbers of her customers. Shyne was upset that McClane had shot the victim and was even more upset when he learned that she had died. Shyne dropped McClane off at McClane's home, and McClane left the jacket he had been wearing in Shyne's car, telling Shyne and the cousin to throw it away.[10] Shyne then drove to his home in San Bernardino, where his cousin threw McClane's jacket and the clothes he had been wearing in Shyne's neighbor's trash cans, and, at Shyne's suggestion, he and Shyne wiped down Shyne's car. All three later agreed to keep quiet about the crimes. About a week after the crimes, Shyne told his cousin that the victim was his prostitute, but she had no pimp.[11] Members of Shyne's family visited the cousin frequently while the latter was in jail awaiting trial in this case. They put money on his commissary account at the jail. He finally wrote them and told them to stop visiting him and stop putting money on his account because it looked like they were trying to bribe him. Shyne's father told the cousin that when it comes to family, the cousin was to shut up, but everyone else could be ratted out.

Although at the time of the crimes Shyne's cousin did not know if Shyne was the victim's pimp, afterward, he felt that he had been bamboozled by Shyne—that Shyne was trying to scare the victim into coming back to him as her pimp.

---

[10] The cousin gave a conflicting account of this at the preliminary hearing, testifying that McClane threw away his own jacket.

[11] The cousin gave conflicting accounts of how he learned that Shyne had pimped for the victim.

B.  *Procedural Background*

A jury convicted Shyne of first degree felony murder (Pen. Code, § 187, subd. (a)), first degree burglary in the presence of another person (§§ 459, 667.5, subd. (c)), and attempted first degree robbery in concert (§§ 211, 213, subd. (a)(1)(A)).  The jury found that defendants committed the offenses for the benefit of, at the direction of or in association with a criminal street gang (§ 186.22, subd. (b)(1)(c)), that a principal had used a handgun, (§ 12022.53, subds. (b) & (e)(1)), that a principal discharged a handgun (§ 12022.53, subds. (c) & (e)(1)), and that a principal discharged a handgun causing death (§ 12022.53, subds. (d) & (e)(1)).

Shyne petitioned under section 1170.95 to vacate his murder conviction and be resentenced.  The trial court found that Senate Bill No. 1437 is unconstitutional, but still ruled on Shyne's petition.  The trial court found that Shyne did not qualify for relief under section 1170.95 because he was a major participant in the offenses and acted with reckless indifference to human life while committing them.  Shyne timely appealed.

III.

DISCUSSION

Shyne's appeal raises four issues:  (1) whether Senate Bill No. 1437 is constitutional; (2) whether the trial court properly denied his section 1170.95 petition; (3) whether a jury should have determined whether he was a major participant and acted with reckless indifference to human life; and (4) whether the trial court abused its discretion in denying Shyne's request to strike the firearm enhancement.  We agree with the parties

that Senate Bill No. 1437 is constitutional.  We agree with the People that the trial court, not a jury, should decide whether a petitioner is entitled to relief under section 1170.95.  We conclude, however, that the trial court improperly denied Shyne's section 1170.95 petition.  Finally, we find that the trial court properly exercised its discretion in denying Shyne's request to strike the firearm enhancement.

A.  *Senate Bill No. 1437 Is Constitutional*

Senate Bill No. 1437, which took effect on January 1, 2019, "limit[ed] accomplice liability under the natural and probable consequences doctrine and the felony-murder rule." (*People v. Cruz* (2020) 46 Cal.App.5th 740, 755; *People v. Lamoureux* (2019) 42 Cal.App.5th 241, 246; *People v. Munoz* (2019) 39 Cal.App.5th 738, 749, review granted Nov. 26, 2019, S258234.)  Before Senate Bill No. 1437's enactment, under the felony murder rule "a defendant who intended to commit a specified felony could be convicted of murder for a killing during the felony, or attempted felony, without further examination of his or her mental state." (*People v. Lamoureux*, *supra*, at pp. 247-248; *People v. Chun* (2009) 45 Cal.4th 1172, 1182.)  "'The felony-murder rule impute[d] the requisite malice for a murder conviction to those who commit[ted] a homicide during the perpetration of a felony inherently dangerous to human life.'" (*People v. Chun*, *supra*, at p. 1184; *People v. Lamoureux*, *supra*, at p. 248.)

Similarly, under the natural and probable consequences doctrine, a defendant was "liable for murder if he or she aided and abetted the commission of a criminal act (a target offense), and a principal in the target offense committed murder (a nontarget

10

offense) that, even if unintended, was a natural and probable consequence of the target offense." (*People v. Lamoureux*, *supra*, 42 Cal.App.5th at p. 248; *People v. Chiu* (2014) 59 Cal.4th 155, 161-162.) "'Because the nontarget offense [was] unintended, the mens rea of the aider and abettor with respect to that offense [was] irrelevant and culpability [was] imposed simply because a reasonable person could have foreseen the commission of the nontarget crime.'" (*People v. Flores* (2016) 2 Cal.App.5th 855, 868.)

Senate Bill No. 1437 was enacted to "amend the felony murder rule and the natural and probable consequences doctrine, as it relates to murder, to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life." (Stats. 2018, ch. 1015, § 1, subd. (f).)

"Senate Bill No. 1437 achieves these goals by amending section 188 to require that a principal act with express or implied malice and by amending section 189 to state that a person can only be liable for felony murder if (1) the 'person was the actual killer'; (2) the person was an aider or abettor in the commission of murder in the first degree; or (3) the 'person was a major participant in the underl[y]ing felony and acted with reckless indifference to human life.'" (*People v. Cornelius* (2020) 44 Cal.App.5th 54, 57, review granted Mar. 18, 2020, S260410.)[12] Several courts have held that Senate Bill No. 1437 is constitutional. (E.g., *People v. Superior Court* (*Gooden*) (2019) 42 Cal.App.5th 270,

---

[12] We may rely on cases pending before the Supreme Court as persuasive authority while review is pending. (Cal. Rules of Court, rule 8.1115(e)(1).)

11

275, 286 [Senate Bill No. 1437 did not unconstitutionally amend Propositions 7 or 115, because it neither added to, nor took away from, those initiatives]; *People v. Lamoureux*, *supra*, 42 Cal.App.5th at pp. 246, 251-252, 256-257, 264-266 [Senate Bill No. 1437 did not improperly amend Propositions 7 or 115 or the Victims' Bill of Rights Act of 2008 (Marsy's Law), and does not violate separation of powers principles by usurping the executive's clemency power or impairing the judiciary's core functions]; *People v. Solis* (2020) 46 Cal.App.5th 762, 769, 779-780; *People v. Cruz*, *supra*, 46 Cal.App.5th at p. 747; *People v. Bucio* (2020) 48 Cal.App.5th 300, 306-307, 310-314; *People v. Smith* (2020) 49 Cal.App.5th 85, 91-92; *People v. Prado* (2020) 49 Cal.App.5th 480, 483, 491-492; *People v. Johns* (2020) 50 Cal.App.5th 46, 54-55; *People v. Lippert* (2020) 53 Cal.App.5th 304.)

We agree that Senate Bill No. 1437 is constitutional, and so do the parties. We therefore conclude the trial court incorrectly found that Senate Bill No. 1437 is unconstitutional.

B. *The Trial Court May Decide Whether a Section 1170.95 Petitioner Was a Major Participant and Acted With Reckless indifference to Human Life*

Shyne argues that the trial court's deciding his section 1170.95 petition violated his constitutional right to a jury trial. We disagree.

Section 1170.95 is an act of lenity by the Legislature and therefore does not implicate a petitioner's constitutional jury rights. (See *People v. Anthony* (2019) 32 Cal.App.5th 1102, 1156 [no right to jury trial under S.B. 1437 because its retroactive

relief is "an act of lenity that does not implicate defendants' Sixth Amendment rights"]; see also *Dillon v. United States* (2010) 560 U.S. 817, 828-829 [sentence modification proceedings based on retroactive amendments to federal sentencing guidelines do not implicate the Sixth Amendment because they were "congressional act[s] of lenity"].) The trial court's deciding Shyne's section 1170.95 petition therefore did not deprive him of his constitutional right to a jury trial. (*People v. Lopez* (2019) 38 Cal.App.5th 1087, 1114.)

      C. *The Trial Court Should Have Granted Shyne's Section 1170.95 Petition*

      After holding an evidentiary hearing, the trial court denied Shyne's section 1170.95 petition. Shyne asserts the trial court should have granted the petition and vacated his murder conviction because he was not a major participant in the robbery of the victim and did not act with reckless indifference to human life in the commission of the offense. We agree that he did not act with reckless indifference to human life.

      1. *Background on Section 1170.95*

      Senate Bill No. 1437 added section 1170.95, which permits persons convicted of murder under a felony murder or natural and probable consequences theory to petition the sentencing court to vacate the conviction. A petitioner convicted of murder under a felony-murder theory, such as defendant, may have the conviction vacated under 1170.95 if the petitioner was not the actual killer, a direct aider and abettor, or a major participant in the underlying felony who acted with reckless indifference to human life. (§ 189, subd. (e).)

13

"Upon the filing of a facially sufficient petition, the trial court must (1) appoint counsel for the petitioner if requested, (2) permit the People to file a response and permit the petitioner to file a reply, and (3) determine whether the petitioner has made a prima facie showing of entitlement to relief.  [Citations.]  In conducting the prima facie review, """"the court takes [the] petitioner's factual allegations as true and makes a preliminary assessment regarding whether the petitioner would be entitled to relief if his or her factual allegations were proved.""""  [Citation.]  The court may consider the record of conviction, but it must not engage in factfinding, weigh the evidence, or reject the petition's allegations on the basis of adverse credibility determinations.  [Citation.]  But if the record of conviction """"contain[s] facts refuting the allegations made in the petition,""""  then the court is justified in rejecting them.  [Citation.]"

"'If the petitioner makes a prima facie showing that he or she is entitled to relief, the court shall issue an order to show cause.'  [Citation.]  We independently review the trial court's ruling on whether the petitioner has made the requisite prima facie showing.  [Citation.]"

"Once the order to show cause issues, the court 'must hold a hearing "to determine whether to vacate the murder conviction and to recall the sentence and resentence the petitioner on any remaining counts."'  [Citation.]  At that hearing, 'the burden of proof shall be on the prosecution to prove, beyond a reasonable doubt, that the petitioner is ineligible for resentencing. . . .  The prosecutor and the petitioner may rely on the record of conviction or offer new or additional evidence to meet their respective burdens.'

14

[Citation.]" (*People v. Jenkins* (2021) 70 Cal.App.5th 924, 933.)

We review the trial court's finding that a defendant is ineligible for section 1170.95 relief for substantial evidence. (*People v. Bascomb* (2020) 55 Cal.App.5th 1077, 1086-1087.)

### 2. *Shyne did not act with reckless indifference to human life*

Reckless indifference to human life "encompasses a willingness to kill (or to assist another in killing) to achieve a distinct aim, even if the defendant does not specifically desire that death as the outcome of his actions." (*People v. Clark* (2016) 63 Cal.4th 522, 617 (*Clark*).) Thus, "[r]eckless indifference to human life 'requires the defendant be "*subjectively* aware that his or her participation in the felony involved a grave risk of death."'" (*People v. Banks* (2015) 61 Cal.4th 788, 807 (*Banks*).)

To determine whether a defendant convicted of felony-murder acted with reckless indifference to human life in participating in the underlying felony, we "must examine the defendant's *personal* role in the crimes leading to the victim's death and weigh the defendant's individual responsibility for the loss of life, not just his or her vicarious responsibility for the underlying crime.' [Citation.] 'The defendant *must be aware of and willingly involved in* the violent manner in which the particular offense is committed,' thereby, 'demonstrating reckless indifference to the significant risk of death his or her actions create.'" (*People v. Law* (2020) 48 Cal.App.5th 811, 817-818, review granted July 8, 2020, S262490.)

15

To make that assessment, we look at these factors: (1) the defendant's knowledge of weapons used to commit the offense; (2) the defendant's presence at the crime scene and whether he or she had the opportunity to prevent the crime or aid the victim; (3) the duration of the felony; (4) the defendant's knowledge of a cohort's likelihood of killing; and (5) the defendant's efforts to minimize the risks of violence during the felony. (*Clark*, *supra*, 63 Cal.4th at pp. 618-623.) No single factor is necessary or sufficient. (*Id*. at p. 618.)

> a. *Shyne's knowledge that weapons would be used during the robbery*

There is no direct evidence that Shyne knew McClane would be armed during the robbery. The People contend it is reasonable to infer that Shyne knew his cousin and McClane would be armed because they were fellow gang members, falsely told them the victim had money and valuables in her room, and told them to "rough up" the victim if they could not find the money or valuables. The People thus argue that Shyne knew his cousin and McClane would be armed because they might have to "rough up" the victim.

But there is no evidence that Shyne's cousin was armed, and he did not know that McClane would be armed. As we explained in our prior opinion, "McClane angrily told the victim to shut up, pulled out a chrome handgun, which [Shyne's] cousin had not known McClane had, and fired without aiming." That Shyne's cousin was unarmed and was unaware that McClane had a gun suggests that Shyne did not believe they would use lethal weapons during the robbery.

16

Nor is there any evidence in the record that Shyne knew that McClane or Shyne's cousin had used weapons in the commission of any prior offense, which cuts against a finding that d Shyne acted with reckless indifference to human life. (See *In re Taylor* (2019) 34 Cal.App.5th 543, 557 (*Taylor*) [finding defendant did not act with reckless indifference in part because there was no evidence he was armed, knew his cohort would use a gun, or that they had "talked beforehand about the use of a gun"].)

Shyne therefore "was less culpable than the defendant in *Clark*, who expected his accomplice to use an unloaded gun to carry out the robbery," and who did not act with reckless indifference to human life. (*In re Scoggins* (2020) 9 Cal.5th 667 at p. 677-678 (*Scoggins*).) Even if Shyne was aware McClane might be carrying a gun, "the mere fact of a defendant's awareness that a gun would be used in the felony [is] insufficient to establish reckless indifference to human life." (*In re Ramirez* (2019) 32 Cal.App.5th 384, 401-402.)

       b. *Shyne's presence at the crime scene and his opportunities to restrain the crime or aid the victim*

"Presence at the scene of the murder is a particularly important aspect of the reckless indifference inquiry." (*People v. Garcia* (2020) 46 Cal.App.5th 123, 148.) Shyne dropped off his cousin and McClane at the victim's motel "and took off." After the shooting, Shyne's cousin and McClane went outside, and McClane tried to call Shyne on a payphone. While he was making the call, Shyne arrived, picked them up, and drove away. It is thus undisputed that Shyne was not at the scene of the killing and had no

17

chance to stop McClane from shooting the victim, which suggests he did not act with reckless indifference to human life.  (See *Scoggins*, *supra*, 9 Cal.5th at p. 677-678; *Banks*, *supra*, 61 Cal.4th at p. 803, fn. 5 ["In cases where lethal force is not part of the agreed-upon plan, absence from the scene may significantly diminish culpability for death."].)

But because Shyne's cousin and McClane told him McClane shot the victim right after getting into Shyne's car, Shyne "was conceivably in a position to aid the victim." (*In re Miller* (2017) 14 Cal.App.5th 960, 975.)  Even so, it is unclear whether Shyne could have done anything to help her by the time he returned to the motel, because we do not know how quickly the victim died after being shot.  There is no evidence that the victim would have survived had Shyne summoned medical attention for her.

We also do not know whether Shyne (or his cousin or McClane) "appreciated how badly [the victim] was wounded."  (*Taylor*, *supra*, 34 Cal.App.5th at p. 559.)  After she was shot, the victim said, "What the f--k?," and Shyne's cousin and McClane fled.  There is no evidence that either of them believed the victim would die, nor is there evidence that they discussed the possibility with Shyne or that they told him about the victim's wounds.

The record is similarly silent as to why Shyne left the scene.  Shyne's leaving the crime scene simply "could have suggested . . . that he wanted to flee the scene as quickly as possible to avoid arrest."  (*Scoggins*, *supra*, 9 Cal.5th at p. 679.)  Because we do not know why Shyne left the scene or whether he understood the severity of the victim's condition,  the "ambiguous circumstances surrounding his hasty departure make it

18

difficult to infer his frame of mind concerning [the victim's] death." (*Clark*, *supra*, 63 Cal.4th at p. 496; *Scoggins*, *supra*, at p. 680 [noting "inherent ambiguity" of defendant's fleeing the scene of a shooting].)

c.  *Duration of the robbery*

The entire robbery lasted less than two minutes, and McClane shot the victim immediately after taking out his gun, which he claimed was an accident.  This factor weighs in Shyne's favor.  (See *In re Miller*, *supra*, 14 Cal.App.5th at p. 975 ["somewhat impulsive" nature of the shooting "counsels against finding defendant exhibited reckless indifference to human life"]; *Scoggins*, *supra*, 9 Cal.5th at p. 681 [no reckless indifference when "entire interaction lasted between a few seconds and three to five minutes"].)

d.  *Shyne's knowledge of a cohort's likelihood of killing*

There is no evidence in the record that Shyne knew his cousin or McClane were likely to shoot the victim.  Nothing in the record shows that either of them "had ever participated in shootings, murder, or attempted murder." (*Banks*, *supra*, 61 Cal.4th at pp. 810-811.)  "[T]here is no evidence that [Shyne] knew [his cousin] or [McClane] was likely to use lethal force." (*Scoggins*, *supra*, 9 Cal.5th at p. 681.)  And contrary to the People's suggestion, the fact that Shyne's cousin and McClane were gang members does not necessarily mean Shyne should have expected that they would use deadly force.  (See *In re Ramirez*, *supra*, 32 Cal.App.5th at p. 405 [mere knowledge of other participants' gang membership is insufficient to support an inference of knowledge or expectation of

19

deadly violence]; accord, *In re Miller*, *supra*, 14 Cal.App.5th at p. 976.)  This factor suggests Shyne did not act with reckless indifference to human life.

e.  *Shyne's efforts to minimize the risks of violence during the robbery*

There is no evidence that Shyne tried to minimize the risks of violence during the robbery.  If anything, the record indicates that Shyne's actions likely *increased* the risks of violence.  He incorrectly told cohorts there would be money and valuables in the victim's room, and that they should "rough her up" if they could not find the money or valuables.  This suggests that Shyne knew his cousin and McClane would act violently toward the victim because he knew they would not find money or valuables in her room.

On the other hand, there is no evidence that Shyne intended for his cousin or McClane to use weapons during the robbery.  """"This fact is, by itself, a significant step towards minimizing the likelihood that the plan would result in a "grave risk of death."'" [Citation.]"  (*Scoggins*, *supra*, 9 Cal.5th at p. 683.)

Considering the record and the factors outlined in *Clark* and *Banks*, we conclude there is insufficient evidence that Shyne acted with reckless indifference to human life.  Like the defendant in *Banks*, who did not act with reckless indifference to human life, Shyne "did not see the shooting happen, did not have reason to know it was going to happen, and could not do anything to stop the shooting or render assistance."  (*Banks*, *supra*, 61 Cal.4th at p. 807.)  In short, "there appears to be nothing in [Shyne's] plan that one can point to that elevated the risk to human life beyond those risks inherent in any armed robbery."  (*Clark*, *supra*, 63 Cal.4th at p. 623.)

20

Our conclusion is consistent with several other cases in which defendants convicted of felony-murder were found not to have acted with reckless indifference to human life. Like this case, they generally involved defendants "who were not wielding guns themselves and also not present for the shooting (either because they were acting as getaway drivers or because they were involved in the planning of the crime only)." (*People v. Law*, *supra*, 48 Cal.App.5th at p. 825.) Other factors that showed the defendants did not act with reckless indifference to human life in those cases are also present in this case.

In *Clark*, our Supreme Court found that the getaway-driver in an armed robbery that led to the victim's murder did not act with reckless indifference to human life. (*Clark*, *supra*, 63 Cal.4th at p. 623.) The defendant's cohort was supposed to commit the robbery with an unloaded gun, but loaded it with one bullet, which he used to shoot and kill the victim. Although the defendant planned the crime, he did not have a gun, he did not plan for his cohort to use a loaded gun, he was not physically present during the murder and therefore could not intervene, and he tried to minimize the risk of violence by timing the robbery to occur after the store closed. (*Id*. at pp. 618-623.) The *Clark* court found the defendant did not act with reckless indifference to human life because there was "nothing in [his] plan that one can point to that elevated the risk to human life beyond those risks inherent in any armed robbery." (*Id*. at p. 623.)

Similarly, in *In re Miller*, *supra*, 14 Cal.App.5th 960, the defendant chose the robbery victim who his cohort later killed, but his involvement in the robbery did not

21

exhibit reckless indifference to human life. Although he was the "mastermind" of the robbery plan, he "was not present at the scene of the killing and therefore had no opportunity to thwart it or assist the victim," and did not know his cohorts would use a gun in the robbery. The murder during the robbery occurred quickly when his cohort "somewhat impulsively" shot the victim after being "unexpectedly confronted." Although the defendant and his cohorts belonged to the same gang and had committed robberies together, there was no evidence that his cohorts had participated in shootings, murders, or attempted murders. (*Id*. at p. 974.) The *Miller* court thus concluded that there was nothing in the defendant's robbery plan "'that elevated the risk to human life beyond those risks inherent in any armed robbery.'" (*Id.* at p. 976.)

The Court of Appeal reached the same conclusion in *In re Bennett*, *supra*, 26 Cal.App.5th 1002. In that case, the defendant was involved with planning the robbery, but was not present at the scene when his cohorts committed it. And although he likely knew that his cohorts were armed, there was no evidence he knew that they "were likely to engage in lethal violence," nor was there any "evidence he instructed the shooters to use lethal force or had the opportunity to stop the shooting." (*Id.* at p. 1025.) Because no evidence suggested that the defendant "anticipate[d] the potential for loss of human life beyond that which usually accompanies an armed robbery," the *Bennett* court held that he did not act with reckless indifference to human life. (*Id.* at p. 1026.)

Shyne also appropriately relies on *Taylor*, *supra*, 34 Cal.App.5th 543, to show that he did not act with reckless indifference to human life. In that case, the defendant and

several of his cohorts participated in the attempted robbery of a liquor store employee as she was making a bank deposit. (*Id*. at pp. 547-548.) The defendant was the getaway driver. Out of his view, one of the participants shot the employee and she died about 30 minutes later. (*Id.* at p. 548.) Although the defendant helped plan the robbery, the evidence was "inconclusive" as to whether he knew his cohort had a gun. (*Taylor*, *supra*, 34 Cal.App.5th at p. 558.) There also was no evidence that the defendant knew his cohort who shot the victim had acted violently before. (*Ibid*.) The struggle between the defendant's cohort and the victim "happened almost immediately," and the defendant was waiting in the car when it occurred, so he "had no opportunity to prevent" it. (*Id*. at p. 559.) Because the evidence did not show that the defendant "planned an armed robbery carrying an increased risk to human life," the *Taylor* court concluded he did not act with reckless indifference to human life. (*Id*. at p. 561.)

Like the defendants in *Clark*, *Miller*, *Bennett*, and *Taylor*, Shyne was not present during the robbery or the shooting. But, unlike the defendant in *Bennett*—who was found not to have acted with reckless indifference to human life despite knowing his cohorts would be armed—there is no evidence Shyne knew that McClane would be armed. Much like the defendants in *Clark*, *Miller*, *Bennett*, and *Taylor*, nothing in the record suggests Shyne knew his cohorts would be armed and were likely to use deadly force to commit the robbery. And like the underlying crimes in *Clark*, *Miller*, *Bennett*, and *Taylor*, the robbery here lasted about two minutes.

23

In our view, the most significant facts in *Clark*, *Miller*, *Bennett*, and *Taylor* are that neither the defendants nor their cohorts had previously committed violent crimes, the defendants were not present at the scene of the crime, they did not help procure the weapons used in the crime, and they did not use guns themselves. (See *People v. Bascomb* (2020) 55 Cal.App.5th 1077, 1090 ["The defendants who have shown their culpability was too slight under *Banks* and *Clark* 'are those who were not wielding guns themselves and also not present for the shooting (either because they were acting as getaway drivers or because they were involved in the planning of the crime only).' [Citation.]"].) Those facts supported the inference that the defendants were not knowingly involved in the violent manner in which the robberies were committed.

Those facts are present here. Although Shyne planned the robbery, he was not present when McClane shot the victim. There is no evidence that he knew McClane would bring a gun or intended to use it while robbing the victim. Indeed, Shyne's cousin, who helped McClane commit the robbery, did not know McClane was armed. There is also no evidence that Shyne was armed or helped McClane procure his gun. Taken together, the facts of this case "counsel[] against finding defendant exhibited reckless indifference to human life." (*In re Miller*, *supra*, 14 Cal.App.5th at p. 975.)

The People emphasize that Shyne knew his cousin and McClane would act violently toward the victim because he instructed them to "rough up" the victim if they could not find valuables in her motel room, knowing that they would not find any. That

24

may be true but it does not mean that Shyne acted with reckless indifference to human life.

Scoggins, supra, 9 Cal.5th 667, which our Supreme Court decided after the parties finished briefing in this case, is instructive. In that case, the defendant planned an unarmed robbery and assault that resulted in the victim's death. (*Id*. at p. 683.) As part of the plan, defendant's cohorts agreed to "launch a surprise, two-on-one attack" on the victim, during which they would "'beat the shit out of him'" and steal his money. (*Ibid*.) During the robbery, however, the defendant's cohorts did not beat the victim or rob him, but instead shot and killed him shortly after ambushing him. (*Ibid*.)

Our Supreme Court held the defendant did not act with reckless indifference to human life "even though the planned assault . . . contemplated the use of violence." (*Scoggins*, *supra*, 9 Cal.5th at p. 682.) Several of the *Clark* factors supported this finding, including: (1) the defendant did not use a gun and did not know his cohorts would use one; (2) the defendant was not present during the offense; (3) the interaction between the victim and the defendant's cohorts lasted "between a few seconds and three to five minutes"; and (4) the defendant returned to the crime scene, checked to see if the victim was breathing, and cooperated with the police when they arrived. (*Id*. at p. 681.)

Most relevant here, the *Scoggins* court observed there was no evidence that the defendant knew his cohorts were likely to use *deadly* force. The *Scoggins* court recognized that lethal force might be expected in an armed robbery, but the defendant planned an unarmed robbery in a public location during the day, neither he nor his

25

cohorts planned to kill the victim, and the evidence suggested only that his cohorts "were prone to some degree of violence." (*Scoggins*, *supra*, 9 Cal.5th at p. 682.) Moreover, the record did not show that the defendant knew his cohorts were likely to deviate from their plan and use lethal force. (*Ibid.*) As the *Scoggins* court explained, the defendant's "'plan included violence, certainly, but the need to minimize the risk of violence when planning an unarmed beating is less pressing than the need to minimize the risk of violence when planning an armed robbery. The record does not contain any indication the defendant planned a beating involving the use of weapons.'" (*Id*. at p. 683.)

So too here. Much like the defendant's plan in *Scoggins*, Shyne's plan did not involve "'an elevated risk to human life beyond those risks inherent in an unarmed beating and robbery.'" (*Scoggins*, *supra*, 9 Cal.5th at p. 682.) The record shows that Shyne planned a robbery that was likely to result in violence against the victim. But there is no evidence that he intended to kill the victim or for his cohorts to be armed. Nor is there evidence that he knew his cohorts were likely to use lethal force. And given that defendant's cohorts outnumbered the victim, who was alone in her hotel room, the robbery did not pose a heightened risk of lethal force. (See *In re McDowell* (2020) 55 Cal.App.5th 999, 1013 [home robbery of drug dealer where defendant and accomplice were outnumbered when inside "posed obvious risks of lethal violence," which supported finding that defendant acted with reckless indifference to human life in committing the robbery].)

26

The record thus does not support the inference that Shyne "knew his own actions would involve a grave risk of death." (*Banks*, *supra*, 61 Cal.4th at p. 807.) Shyne "did not see the shooting happen, did not have reason to know it was going to happen, and could not do anything to stop the shooting." (*Id.* at p. 807; compare, *In re McDowell*, *supra*, 55 Cal.App.5th at p. 1015 [defendant acted with reckless indifference to human life when he "armed himself with a knife, planned and carried out a crime with obvious risks of lethal violence, and was present at the scene but took no steps to prevent the killing"]; *People v. Bascomb*, *supra*, 55 Cal.App.5th at p. 1089 [defendant and cohort acted with reckless indifference by committing armed robbery at known drug dealer's residence, forcing one victim to the ground, and using "their guns to threaten the residents and keep them pinned down throughout the duration of the robbery"].)

On this record, we conclude there is insufficient evidence that Shyne acted with reckless indifference to human life. We therefore reverse the trial court's order denying Shyne's section 1170.95 petition and remand with instructions to grant the petition, vacate Shyne's conviction on count 1, and resentence him accordingly. (See *Clark*, *supra*, 63 Cal.4th at p. 614 [reversing murder special circumstance findings without deciding whether defendant was major participant because defendant did not act with reckless indifference].)

D. *Firearm Enhancement*

The jury found, among other things, that a firearm was used in the commission of all three of defendant's offenses. Because of these finding, the trial court imposed an

additional term of 25 years to life for each conviction.  The trial court, however, stayed the terms associated with count 2 and 3 under section 654, which resulted in a 25-year-to-life firearm enhancement imposed only on Shyne's conviction for felony murder (count 1).

In his section 1170.95 petition, Shyne asked the trial court to use its "discretion in the interests of justice to strike the firearm enhancement" and the resulting 25-to-life sentence.  The trial court denied his request.  The court explained its ruling as follows: "Consistent with this court's ruling, reviewing all the gun charges, understanding the testimony adduced at trial, the jury's verdicts, the jury's findings, as for revisiting the court's discretion to review the gun enhancements, the court believes the findings of the jury should stand as recited.  And this court does not choose to disturb those findings and/or exercise its independent discretion today because it has it based on the new law to change that finding.  What happened, happened and we can't say it was otherwise.  So the request to strike the firearm enhancements is respectfully denied."

Because we direct the trial court to grant Shyne's section 1170.95 petition and the trial court stayed the firearm enhancements imposed on counts 2 and 3 under section 654, we remand the matter for resentencing so it "can exercise its sentencing discretion in light of the changed circumstances." (*People v. Navarro* (2007) 40 Cal.4th 668, 681.)  On remand, the trial court may consider whether the stay should be lifted as to the enhancement terms on counts 2 and 3.  (See *People v. Ramirez* (2019) 41 Cal.App.5th 923, 933 ["The matter is remanded to the superior court with directions to grant the

[section 1170.95] petition, vacate defendant's murder conviction, and resentence him on the remaining counts."]; see also *People v. Burbine* (2003) 106 Cal.App.4th 1250, 1259 ["[U]pon remand for resentencing after the reversal of one or more subordinate counts of a felony conviction, the trial court has jurisdiction to modify every aspect of the defendant's sentence on the counts that were affirmed, including the term imposed as the principal term."].)

IV.

DISPOSITION

The trial court's order denying Shyne's section 1170.95 petition is reversed.  On remand, the trial court is directed to grant the petition, vacate Shyne's felony murder conviction, and resentence him accordingly.  In all other respects, the judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

CODRINGTON
J.

We concur:


McKINSTER
Acting P. J.


FIELDS
J.